UNITED STATES of America, Appellee,

v.

James Alvin RHODES, a/k/a Mickey
Rhodes, Appellant.

UNITED STATES of America, Appellee,

v.

Garvey Martin CHEEK, Jr., Appellant.

Nos. 84–5241, 84–5242.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1985.
Decided Dec. 26, 1985.

Thomas K. Maher, Thomas F. Loflin, III (Loflin & Loflin, Durham, N.C., Irvin B. Tucker, Blanchard, Tucker, Twiggs, Earl & Abrams, Raleigh, N.C., David S. Rudolf, Beskind & Rudolf, Durham, N.C., on brief), for appellants.

Max O. Cogburn, Jr., Asst. U.S. Atty. (Charles R. Brewer, U.S. Atty., Asheville, N.C., on brief), for appellee.

Before WIDENER, PHILLIPS and SNEEDEN, Circuit Judges.

WIDENER, Circuit Judge:

Garvey Martin Cheek and James Alvin "Mickey" Rhodes were convicted under 21 U.S.C. § 848 and other statutes for engaging in a continuing criminal enterprise (CCE) and other offenses on the basis of their dealings in controlled substances. Cheek received a 75–year sentence without parole under § 848, while Rhodes received a 50–year sentence without parole under that statute. Both received various other sentences. Cheek and Rhodes appeal their convictions on several grounds, but we find no reversible error and affirm.

Cheek and Rhodes were convicted after a jury found them guilty of several charges in a multicount indictment. Count 1 of the indictment charged that from August 1978 through April 1980 Cheek and Rhodes and others conspired together and with yet others to possess and distribute cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846. Counts 4 and 5 charged that on or about November 22, 1979 Cheek, Rhodes and others unlawfully possessed with intent to distribute more than 1000 pounds of marijuana, and that they did distribute same in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Counts 6 and 7 of the indictment charged Cheek, Rhodes and others with an April 1980 unlawful possession with intent to distribute and with the distribution of greater than 1000 pounds of marijuana in violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2. In Counts 2 and 3, Cheek and others were charged with the unlawful possession with intent to distribute and the distribution of approximately four kilograms of cocaine in or about October 1979. Counts 8, 10, and 11 charged Cheek with separate Travel Act violations under 18 U.S.C. § 1952, and Count 12 charged that Cheek engaged in a continuing criminal enterprise from October 1979 to April 1980 in violation of 21 U.S.C. § 848. Count 16 of the indictment charged Rhodes with engaging in a continuing criminal enterprise from October 1978 to April 1980 in violation of 21 U.S.C. § 848. Cheek was convicted on the charges in all eleven counts and received total sentences of 75 years on the felony

violations other than for a continuing criminal enterprise, to run concurrently with a 75-year no parole sentence on the continuing criminal enterprise conviction. Rhodes was convicted of the charges in all six counts and received total sentences of forty-five years on the felony convictions other than for a continuing criminal enterprise, to run concurrently with a 50-year no parole sentence on the continuing criminal enterprise conviction.

No question is raised as to the sufficiency of the evidence to support any of the convictions except those of the continuing criminal enterprise under 21 U.S.C. § 848.

Cheek's and Rhodes' convictions arose out of various illegal drug operations through which large quantities of cocaine and marijuana were transported from either Florida or South Carolina into the Western District of North Carolina. The evidence showed that both Cheek and Rhodes were involved in bringing controlled substances into North Carolina on several occasions. While the evidence regarding Cheek's and Rhodes' involvement in the smuggling operations overlaps to a certain extent, we will discuss separately the evidence as it relates to each.

CHEEK

Viewing the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the record shows that Cheek was involved in several drug transactions during the relevant time period charged in the continuing criminal enterprise count. The evidence shows that during late October and early November 1979, Cheek at his residence in Perrine, Florida arranged for the purchase of four kilograms of cocaine from one Maynard Gonzalez, Jr. for a price of $208,000. Gonzalez let Cheek take possession of all four kilograms of the cocaine in exchange for payment of one-half of the purchase price. After paying $104,000 to Gonzalez, Cheek took possession of the cocaine in Florida. Cheek and Rocky Townsend, a witness for the government, loaded the cocaine into a car and drove to Wilkes County, North Carolina, where the cocaine was distributed to Shelton Wiles. Several weeks after Cheek and Townsend had delivered the cocaine to Wiles in North Carolina, Cheek called upon Townsend to deliver the balance of the cocaine purchase price to Gonzalez at a motel in Charlotte, North Carolina. Townsend complied and delivered the money to Gonzalez for Cheek.

The evidence shows that Cheek undertook this large cocaine transaction to make enough money to cover expenses on an upcoming marijuana transaction that was scheduled to occur around Thanksgiving of 1979. Government witness Jorge Felix Aragon testified that he and his brother, Fred Aragon, arranged to import 5000 pounds of marijuana from Columbia, South America into Florida and that they intended to sell the marijuana to Cheek, Rhodes, and an unnamed individual. Like the Aragons had done on previous marijuana importations, on the Thanksgiving deal they were responsible for obtaining the marijuana in Columbia and for the transportation and offloading of such in southern Florida. The record fairly shows that Cheek was responsible for making the arrangements to receive the marijuana from the offloaders and to transport it to a "stash house" for later distribution into North Carolina. Cheek directed two women, Dorothy Hodges and Peggy Jordan, to rent rooms at two motels in Homestead, Florida, where the marijuana would be received from the offloaders. Townsend, at Cheek's direction, accompanied Hodges and Jordan to two motels, and two rooms were rented. From the two motel rooms, the marijuana would be transported to the stash house which had been secured by Jorge Aragon. As planned, the offloaders drove the marijuana from the coast to the motel rooms, and several individuals who knew where the stash house was located, but who had no relationship with the offloaders, drove the marijuana to the stash house for unloading and weighing. Cheek, Aragon, and Duke Shew waited at the stash house and were responsible for weighing and numbering the bales of marijuana. Within a few days,

the transfer process was completed and all but 1200 pounds of wet marijuana was taken from the stash house for distribution. Cheek, Aragon, and Dorothy Hodges soon thereafter flew into Charlotte, North Carolina, and went to Rhodes' house in North Wilkesboro, where they met Rocky Townsend who had driven a load of the wet marijuana out of Florida. Cheek and Aragon spread out the wet marijuana in Rhodes' garage and worked for a few days to dry it out. Thereafter, Aragon stayed in Wilkesboro waiting for Cheek and Rhodes to sell the marijuana from the Thanksgiving deal so that they would be able to pay Aragon with the proceeds. Shortly thereafter, however, Cheek arranged for Rocky Townsend to leave North Carolina and to drive down to Cheek's house in Florida to pay Aragon $500,000 for the marijuana. At Cheek's direction, Townsend drove to Cheek's house in Florida and paid Aragon $500,000 for the marijuana.

The evidence shows that Cheek was involved in another marijuana transaction with Jorge Aragon in the spring of 1980. Cheek accompanied Aragon to Barranquilla, Columbia in preparation for an upcoming deal. Through the Aragon brothers' Columbian connection, 10,000 pounds of marijuana would be airdropped to a yacht off the Florida Keys, unloaded at a house in Islamorada in the Keys, and distributed to Cheek, Rhodes, and unnamed "people up north." Fred Aragon arranged for the Islamorada house and instructed his brother Jorge to stay in the Florida Keys and monitor Coast Guard movement. Before the airdrop, Jorge Aragon contacted Cheek and told him that he needed more money for expenses on the Islamorada operation. Cheek contacted Shelton Wiles and told him to get someone to bring down more money to Florida for expenses. The next day, Cheek's wife flew down to Florida and gave Cheek $10,000. Cheek gave Aragon the money and directed Rocky Townsend to assist Aragon in monitoring Coast Guard activity. The airdrop was successful and the marijuana was unloaded at the Islamorada house. Cheek, Aragon, Townsend, and an unnamed Cuban weighed the mari-

juana, separated out the bales that were wet, and loaded the dry bales into cars. Townsend testified that he remembered loading the cars for Tony Sidden and his wife, Gloria Sidden, and Wayne Shepherd; and such testimony is consistent with Jorge Aragon's testimony to the effect that he recalled these three individuals were working for Cheek. When the marijuana had been weighed and loaded into cars, Townsend drove a carload of marijuana to Statesville, North Carolina, and Aragon went up to North Carolina to collect from Cheek and Rhodes for their respective purchases of 6500 and 1100 pounds of the Islamorada marijuana.

RHODES

The record shows that Rhodes was involved in several marijuana transactions during the relevant time period charged in the CCE count, October 1978 through April 1980. Government witness Jeffrey VanMeter testified that he and Rhodes had been involved in several marijuana deals in 1978 and 1979. The evidence shows that in late 1978 Cheek unloaded 17,000 pounds of marijuana (that Cheek had been involved in importing through Myrtle Beach, South Carolina) at a farm in Alexander County, North Carolina which Rhodes had used previously for distribution of marijuana. In the words of VanMeter, part of the 17,000-pound load did not go to Rhodes but, rather, went to someone else. The record shows that Rhodes, VanMeter, and Russell Gambill worked together to sell their portion of the 17,000-pound load and that when Cheek went to Rhodes' house to collect the money on the marijuana that he had fronted, they returned 2000 pounds of the marijuana they could not sell.

The evidence shows that Rhodes became involved with the Aragon brothers in the fall of 1978 when the Aragons smuggled a load of marijuana into Miami, Florida from Columbia, South America and through VanMeter sold a quantity of marijuana to Rhodes. In early 1979, Rhodes met with the Aragons in Wilkesboro and they discussed whether Rhodes would help finance an airplane so that the Aragons could con-

tinue their smuggling ventures by air rather than sea. Although the record does not show clearly whether Rhodes agreed to finance the venture, it does show that the Aragons were able to purchase an airplane and that they planned to airdrop a load of marijuana in the spring of 1979, promising to give at least 2000 pounds to Rhodes in exchange for some money that he had paid to them. Jorge Aragon testified that from this airdrop operation they did not have 2000 pounds of marijuana to give to Rhodes and that he was not sure how much Rhodes actually received.

Aside from Rhodes' involvement with the Aragons, the evidence shows that Rhodes obtained marijuana from another source in Florida. The record shows that in May or June of 1979 Rhodes sent several cars from North Wilkesboro to Fort Lauderdale to pick up marijuana from two friends named Patty and Rob. VanMeter testified that he went to Fort Lauderdale and loaded the marijuana in the cars that Rhodes had sent from North Carolina. VanMeter testified that after he loaded the cars he went to North Wilkesboro, where Rhodes gave him $600,000 to take back to Patty and Rob in Fort Lauderdale. VanMeter, accompanied by Clay Green, went to Florida and paid Patty and Rob for Rhodes.

The evidence shows that after the Fort Lauderdale transaction Rhodes became involved with the Aragons and Cheek in the Thanksgiving marijuana deal of 1979. Before the importation, Rhodes sent VanMeter down to Florida, and Jorge Aragon filled VanMeter in on the details of the operation to transport the marijuana from the two motel rooms, which Cheek had arranged to be rented, to the stash house for distribution. VanMeter drove two carloads of marijuana to the stash house but quit and went to Fort Lauderdale because he was disgusted that the marijuana was wet. While the record shows that Wayne McNeil took VanMeter's place in the Thanksgiving operation, VanMeter testified that he later helped McNeil load up a motor home with marijuana at Cheek's house in Florida. When the distribution had been accomplished, Cheek and Aragon arrived at Rhodes' house in Wilkesboro and attempted to dry out a load of the wet marijuana which had been brought out of Florida. After Cheek and Aragon had finally dried the marijuana, Rhodes refused to let them stay at his house. VanMeter further testified that shortly after the Thanksgiving deal with Cheek and Aragon, he drove a load of 600 to 700 pounds of marijuana supplied by Patty and Rob from Florida to North Carolina and that for his efforts Rhodes paid him $1,000.

The record shows that Rhodes was again involved with Jorge Aragon and Cheek in the 1980 marijuana importation off Islamorada, although it does not indicate that Rhodes was involved in any planning of the operation with Aragon and Cheek. However, the evidence does show that Aragon called Rhodes and told him that the Islamorada marijuana load was in and to send some people down to pick up what Aragon could give him from the load. Aragon testified that four drivers came to Florida and picked up approximately 1100 pounds of the marijuana for Rhodes. Aragon could identify two of the drivers as Wayne McNeil and Kim Edmiston but was unable to identify the other two drivers.

In addition to the detailed evidence which was presented by the government with respect to the aforementioned marijuana deals, Peggy Jordan and Dorothy Hodges testified that they went to Florida to pick up carloads of marijuana for Rhodes in the summer of 1979. Dorothy Hodges further testified that during this time period Wayne McNeil, Kim Edmiston, and a man named "Clay" drove her car to Florida to pick up marijuana for Rhodes.

Cheek and Rhodes appeal their CCE convictions on several grounds. Cheek and Rhodes assert: that they were improperly convicted of engaging in a continuing criminal enterprise under 21 U.S.C. § 848; that their respective sentences of 75 years without parole and 50 years without parole violate the Eighth Amendment's prohibition against cruel and unusual punishment since the sentences are disproportionate to

the crimes for which they were convicted; that the district court committed reversible error by admitting evidence of other wrongs or acts committed by both defendants which were not charged in the indictment; and that the district court improperly admitted the contents of a spiral notebook, allegedly containing drug business records between Rhodes and Cheek, because the notebook was seized in violation of the defendants' Fourth Amendment rights. Rhodes separately argues that the court improperly admitted a statement he made to police officers that allegedly was the product of custodial interrogation. We will address these contentions in order.

## CCE CONVICTIONS

To obtain a CCE conviction under § 848, the government must prove that the accused violated a specified federal drug law, the violation of which is punishable as a felony, *see* 21 U.S.C. § 801 *et seq.*,[1] and that such violation was part of a "continuing series of violations" of the specified federal drug laws. Section 848(b)(2) sets forth the essential elements for what constitutes a continuing series of violations by providing in relevant part that:

> [S]uch violation is a part of a continuing series of violations [of the specified drug laws]—
>
> (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
>
> (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(b)(2). Cheek and Rhodes argue that their CCE convictions were improper because the government failed to prove that either defendant occupied a managerial, organizational, or supervisory position over the requisite number of people within the proscription of § 848(b)(2)(A). They contend that § 848 requires the government to prove that an accused occupied a managerial position with respect to at least five persons on each of the underlying felony drug violations constituting the continuing series of violations. The government, on the other hand, takes the position that § 848 merely requires proof that an accused occupied a managerial, organizational, or supervisory position with respect to at least five people during the course of the overall series of violations.

To support the contention that the CCE convictions were improper because the government failed to prove that either defendant occupied a managerial position with respect to at least five people on each underlying violation, defendants contend that the language of the statute itself indicates that the numerosity requirement relates to each individual violation as opposed to the series of violations as a whole. In this regard, they point to the relevant part of § 848 which provides that the government must prove that a specific felony drug violation "is a part of a continuing series of violations ... which *are* undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management." *Id.* § 848(b)(2)(A) (emphasis added). The argument goes that if Congress had intended for the numerosity requirement to relate to the entire series of violations as a whole, Congress would have used the word "is" instead of "are" as the proper verb form to indicate that the numerosity inquiry focuses on whether the *series* of violations *is* undertaken in concert with five or more other persons. The use of the word "are" indicates, the defendants say, that Congress intended for the five-person requirement to relate to the term "violations" rather than to the term "series" and that, consistent with this legislative intent, the five-person minimum must be proven with respect to each underlying felony drug vio-

---

**1.** Controlled Substances Act, Pub.L. No. 91–513, 84 Stat. 1242 (codified as amended at 21 U.S.C. §§ 801–904); Controlled Substances Import and Export Act, Pub.L. No. 91–513, 84 Stat. 1285 (codified as amended at 21 U.S.C. §§ 951–970).

lation. Cheek and Rhodes assert that since the government did not prove that either of them occupied a managerial position with respect to five people during any of the underlying drug violations, their CCE convictions were improper and should be reversed.

We have found no cases to support the sought for construction of § 848. Defendants have candidly admitted that courts considering the five-person requirement uniformly have found that the five people under a defendant's management need not have worked in the drug business at the same moment. *See United States v. Smith*, 690 F.2d 748, 750 (9th Cir.1982), *cert. denied sub nom. Fisherman v. United States*, 460 U.S. 1011, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983); *United States v. Losada*, 674 F.2d 167, 173–74 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982); *United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir.1981), *cert. denied sub nom. Meinster v. United States*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Barnes*, 604 F.2d 121, 157 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Bolts*, 558 F.2d 316, 320–21 (5th Cir.), *cert. denied sub nom. Hicks v. United States*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1970); *United States v. Sperling*, 506 F.2d 1323, 1344 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). They contend, however, that these cases do not stand for the proposition that the required five people need only act sometime during the course of the related drug violations. Instead, the claim is that these cases simply find that the five people need not have been acting at the same moment during each specific violation, and, accordingly, defendants concede that for each underlying violation it would be sufficient for the five people to have been involved in such at different times.

We, however, are unpersuaded by either of defendants' constructions of § 848. The Second Circuit in *United States v. Sperling*, 506 F.2d 1323 (2d Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43

L.Ed.2d 439 (1975), rejected a defendant's contention that his CCE conviction was improper because the evidence failed to show that five people were working in his narcotics business at the same moment. The court noted that the defendant Sperling was an operational kingpin of a highly organized, structured and on-going narcotics network and that the evidence clearly showed that during the relevant time period charged in the indictment, greater than five people were engaged in Sperling's narcotics operation and were directly under his supervision. *Id.* at 1344. In deciding that § 848 did not require proof that at least five people worked under the defendant at the same moment, the court found the statute merely required proof that the person charged acted " 'in concert with five or more other persons' and as to them that he occupied 'a position of organizer, a supervisory position, or any other position of management.' " *Id.*

As stated, defendants argue that *Sperling* and the cases which later followed are distinguishable on the ground that these cases did not hold specifically that five people need only work for a defendant some time during the course of the violations comprising the series, regardless of the number of people who participated in the underlying violations. Accordingly, they argue that we would not be in conflict with other circuits if we were to hold that § 848 requires proof that at least five people worked under a defendant's supervision on each violation comprising the series of violations, whether or not the minimum five people worked simultaneously on each violation.

We disagree. In *United States v. Smith*, 690 F.2d 748 (9th Cir.1982), *cert. denied sub nom. Fisherman v. United States*, 460 U.S. 1011, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983), the defendant challenged his CCE conviction by arguing that the government failed to prove that he directly supervised five people for each of the acts embodying the continuing series of violations. *Id.* at 749. The jury convicted the defendant on six counts in the fifteen-

count indictment. To support his claim of improper CCE conviction, the defendant emphasized that four of the substantive counts of the indictment involved fewer than five people. Notwithstanding, the Ninth Circuit, in *Smith*, relied on *Sperling* and rejected the defendant's construction of § 848 by reasoning that it was not necessary for the government to show that "the organizer worked with five or more persons at the same moment." *Id.* at 750. Needless to say, we consider the holding of the case to be more important than the use of the *Sperling* language.

 We agree with the Ninth Circuit's construction of § 848 and hold that the five other persons mentioned in the statute need not be under a defendant's supervision at the same moment nor in the conduct of the same underlying felony. It is enough that they are found to be under the defendant's supervision in the conduct of the same continuing criminal enterprise, as here.

 We think the record fairly shows that both Cheek and Rhodes acted in concert with five or more other persons and that each occupied a position of organizer, supervisor, or manager with respect to those individuals. There is credible evidence to show that from the period of October 1979 through April 1980 Cheek occupied a position of organizer, supervisor, or manager with respect to Rocky Townsend, Dorothy Hodges, Peggy Jordan, Judy Cheek, Shelton Wiles, Tony Sidden, Gloria Sidden, and Wayne Shepherd, to name a few. Thus, as to Cheek, the evidence clearly was sufficient to support his CCE conviction. Likewise, we think the evidence is sufficient to support Rhodes' conviction since it fairly shows that from October 1978 through October 1980 Rhodes occupied a managerial, supervisory or organizational position with respect to at least six individuals, including Jeffrey VanMe-

ter, Clay Green, Wayne McNeil, Kim Edmiston, Peggy Jordan, and Dorothy Hodges.

### EIGHTH AMENDMENT

Cheek and Rhodes assert that imposition of their respective sentences is cruel and unusual punishment in violation of the Eighth Amendment because the sentences are disproportionate to the crimes for which they were convicted. At the time Cheek received his sentence of 75 years without parole, we are told he was 38 years old. Assuming the maximum amount of good time credit as provided in 18 U.S.C. § 4161, Cheek would have to serve approximately 50 years, thereby becoming eligible for release at the age of 88. At the time Rhodes received his 50-year sentence without the possibility of parole, he was 42 years old. Accounting for maximum good time credit, Rhodes would have to serve approximately 33⅓ years of this sentence and would become eligible for release at the age of 76.[2] Cheek and Rhodes argue that their respective sentences are effectively life sentences without parole, given their advanced years, upon their prospective release dates under present law. Because, they argue, the sentences are *de facto* life sentences without possibility of parole, they maintain that the Supreme Court's recent decision in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), requires us to undertake an extensive proportionality review of defendants' sentences in accordance with a three-part test announced by the Court.

In *Solem*, the Supreme Court declared unconstitutional a sentence of life imprisonment without possibility of parole and, in so doing, set forth a three-part test involving "objective factors" to use in reviewing the proportionality of sentences under the Eighth Amendment. 463 U.S. at 290–303, 103 S.Ct. at 3010–16. Significantly, the Court in *Solem* held for the first time that a noncapital sentence was disproportionate

---

**2.** These prospective dates for release are only illustrative, however. Cheek currently is serving another sentence, and the sentencing judge found that the CCE sentence would run consec-

utively with that sentence. Rhodes, on the other hand, has been free on bond since his CCE conviction.

to the crime committed and stated, "we hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Id.* at 290, 103 S.Ct. 3010. In declaring the life sentence imposed under South Dakota's recidivist statute disproportionate, *Solem* distinguished the earlier decision of *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), which had upheld imposition of a life sentence under Texas' recidivist statute, on the ground that the defendant Rummel was eligible for parole, while, under South Dakota law, no prospect of parole attached to Helm's life sentence.[3] 463 U.S. at 297 & n. 24, 300–03, 103 S.Ct. at 3013 & n. 24, 3015–16. The question left open after *Solem* is whether, because a life sentence without possibility of parole will cause a proportionality review, a severe sentence of a term of years, as here, similarly requires review. We note this issue to emphasize the fact that notwithstanding the Court's review of such a life sentence in *Solem* the Court has never set aside as cruel and unusual punishment a sentence for a term of years that is within the limits set by statute. *See Hutto v. Davis*, 454 U.S. 370, 372, 102 S.Ct.

703, 704, 70 L.Ed.2d 556 (1982) (per curiam).

In *Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per curiam), the Supreme Court reversed an *en banc* decision of this court in which we had affirmed the district court's invalidation of consecutive sentences for a total term of 40 years upon finding such sentences disproportionate to the crime committed. *See Davis v. Zahradnick*, 432 F.Supp. 444 (W.D.Va.1977), *aff'd sub nom. Davis v. Davis*, 646 F.2d 123 (4th Cir.1981) (en banc) (per curiam), *rev'd sub nom. Hutto v. Davis*, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982). Relying on its earlier pronouncement in *Rummel*, the Court in *Davis* emphasized that courts "should be 'reluctant to review legislatively mandated terms of imprisonment'" and, moreover, that "'successful challenges to the proportionality of particular sentences' should be 'exceedingly rare.'" 454 U.S. at 374, 102 S.Ct. at 706, *quoting Rummel*, 445 U.S. at 272, 274, 100 S.Ct. at 1138, 1139. Therefore, to the extent that *Solem* does not overrule the reasoning of *Rummel* and *Davis* but, rather, explicitly accepts the posi-

**3.** The defendant Rummel was convicted in a Texas state court for two separate felonies: fraudulent use of a credit card to obtain $80 worth of goods or services and passing a forged check in the amount of $28.36. *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). Rummel pleaded guilty to the 1964 credit card offense and was sentenced to three years' imprisonment. He also pleaded guilty to the 1969 forgery offense and was sentenced to four years' imprisonment. In 1973, Rummel was charged with obtaining $120.75 by false pretenses. Since the latter offense was classified as a felony under Texas law, the prosecution proceeded against Rummel under Texas' recidivist statute and, pursuant to such, Rummel received a mandatory life sentence with the possibility of parole. 445 U.S. at 265–66, 278, 100 S.Ct. 1134–35, 1141.

In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the defendant Helm was convicted of what the Court classified as six nonviolent felonies under South Dakota law during the period between 1964 and 1975. 463 U.S. at 279, 103 S.Ct. at 3004. These convictions included third-degree burglary in 1964, 1966, and 1969; obtaining money under false pretenses in 1972; grand larceny in 1973; and,

in 1975, a third offense of driving while intoxicated, punishable as a felony. In 1979, Helm was charged with uttering a "no account" check for $100 and pleaded guilty to the uttering offense, which, ordinarily, would have carried with it a sentence of five years' imprisonment and a $5,000 fine. However, because of his prior record, Helm was subject to the South Dakota recidivist statute. Under the statute, Helm received a life sentence without possibility of parole. *Id.* at 281–82, 103 S.Ct. at 3065.

In distinguishing *Rummel*, the *Solem* Court noted that Helm's sentence was far more severe than Rummel's because, at the time the Court considered Rummel's sentence, it was likely that Rummel would have been eligible for parole within 12 years of his initial confinement. *Id.* at 297, 103 S.Ct. at 3013. On the other hand, given the fact that Helm was sentenced for life with no possibility of parole, the Court commented that capital punishment was the only punishment exceeding Helm's in severity. *Id.* Furthermore, the Court specifically refused to decide *Solem* under the reasoning of *Rummel* by equating the possibility of parole that existed in Texas with the possibility of executive clemency that existed in South Dakota. *Id.* 463 U.S. at 300, 103 S.Ct. at 3013.

tion asserted in those cases, that in noncapital cases successful proportionality challenges will be extremely rare, 463 U.S. at 289–90, 103 S.Ct. at 3009, it seems to us that *Solem* requires an extensive proportionality analysis only in those cases involving life sentences without parole. We are inclined to interpret *Solem* in this light, especially given the *Solem* Court's refusal to overrule *Rummel* and *Davis*, and accordingly uphold the terms of years' sentences herein as appropriate sentences within the limits set by Congress.

Such a disposition is complicated, however, by the fact that defendants equate their sentences for terms of years without parole with life sentences without parole because of their ages. Thus, as an alternate ground for our decision, we uphold the sentences because they withstand an analysis under *Solem*. Defendants rely on *United States v. Darby*, 744 F.2d 1508 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985), as authority for this court to undertake an extensive proportionality review. In *Darby,* the court determined that *Solem* required an extended analysis of the proportionality of two 60-year sentences imposed under § 848 because it found the scheme prescribing enhanced penalties for federal drug violations to be similar to the recidivist statutes involved in *Rummel* and *Solem,* 744 F.2d at 1526. The court then undertook a thorough review by applying the three-part *Solem* test to consider "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id., quoting Solem,* 463 U.S. at 292, 103 S.Ct. at 3011. After the court conducted its extensive review, it determined that although the sentences were severe, they were "not so grossly disproportionate to their crime to constitute cruel and unusual punishment." *Id.* at 1526–29.

With respect to the appropriate steps we should now take, we note that the Supreme Court in *Solem* warned:

Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.

463 U.S. at 290, 103 S.Ct. at 3010. By way of footnote, the majority further added:

... we do not adopt or imply approval of a general rule of appellate review of sentences. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the appellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, *a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.*

*Id.* at 290 n. 16, 103 S.Ct. at 3010 n. 16 (emphasis added).

█] Unlike the court in *Darby,* we do not think that the sentences imposed in this case require an extended proportionality analysis. Given the substantial deference that should be accorded Congress and the sentencing court, our duty is to decide whether the sentences under review are within the constitutional limits. *See* 463 U.S. at 290 n. 16, 103 S.Ct. at 3010 n. 16. Such a review, as one court has noted, often requires at least a perfunctory *Solem* analysis. *See Moreno v. Estelle,* 717 F.2d 171, 180 & n. 10 (5th Cir.1983). While we would not use the same adjective to describe the analysis because of its overtones, we think that court meant less than extended and are of opinion that in cases where an Eighth Amendment claim is made concerning the length of a sentence which may not be disposed of as so obviously within the prerogative of Congress and the district court to require no comment, that a simple matching of the facts of a particular

case against the *Solem* principles will suffice without extended discussion. That is what we do here.

■] After reviewing Cheek's and Rhodes' sentences under the principles set forth in *Solem,* we are of opinion that they are not disproportionate within the meaning of the Eighth Amendment. There is no doubt that their crimes were indeed serious. They were involved in many importations and distributions of cocaine and marijuana. There was evidence that Rhodes and Cheek opened up the Wilkes County market for illegal drugs for Jorge Aragon. Time after time during 1978 through April 1980, both defendants actively participated in bringing large quantities of controlled substances into North Carolina. The marijuana involved was measured by the ton and the cocaine by the kilogram; millions of dollars were involved; so this was not the operation of small scale dope peddlers selling on street corners. Continuous large-scale drug trafficking is a grave offense and Congress chose to impose severe penalties for it. *See* H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 4566, 4576. Furthermore, many defendants convicted under § 848 have received sentences comparable to those Cheek and Rhodes received. *See United States v. Love,* 767 F.2d 1052 (4th Cir.1985); *Darby,* 744 F.2d at 1528–29 (citing cases). In many of these cases, moreover, the validity of the severe sentences was not attacked. We note that while cases under § 848 involve many different fact situations which may appear to be either more or less serious than the offenses involved here, insofar as sentencing is concerned Congress drafted the penalty provisions of the Controlled Substances Act, *see* 21 U.S.C. §§ 801 *et. seq.,* to "give maximum flexibility to judges, permitting them to tailor the period of imprisonment...to the circumstances involved in the individual case." H.R.Rep. No. 1444, *supra,* at 4576. We also note that the House Report above referred to, 1970 U.S. Code Cong. & Ad.News, p. 4575, quotes with approval the Prettyman Report (Report of the President's Advisory Committee on Narcotics and Drug Abuse, November 1963), which we think fairly states the intent of Congress as follows:

> The illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive.

Considering the large amount of illegal drugs involved, the huge amounts of money, the extent of the operation, and the number of people involved, we do not think that the sentencing court abused its discretion in imposing severe sentences on the defendants, particularly in light of the fact that Congress intended for judges to tailor specific sentences according to the circumstances involved in each case to make participation in the drug traffic too dangerous to be attractive.

We conclude that the sentences, although they are indeed severe, are not disproportionate to the crimes committed so as to constitute cruel and unusual punishment.

## BAD ACTS EVIDENCE

Cheek and Rhodes individually raise several assignments of error concerning the admission of evidence of other crimes and wrongs which were not charged in the indictment. We will address their contentions separately.

■ Cheek objects to the admissibility of evidence surrounding his purchase of two Ferrari automobiles for $33,000 each, which he paid for in cash, for which payment he declined to accept receipts. He had the cars titled in the name of his mistress. The argument is that this was proof of inadmissible bad acts under FRE 404(b). We think, however, that proof of such large cash purchases in the circumstances present here was relevant evidence under 21 U.S.C. § 848(b)(2)(B) which requires proof that a defendant obtain substantial income or resources on account of one or more of the series of violations mentioned in the statute.

■ The evidence introduced by the government as to Cheek's personal drug use, as well as the general pattern of his personal life, we do not think was plain error.

■ Finally, with respect to this aspect of Cheek's argument, as his brief may be read to object to the closing argument of the United States Attorney, even if the argument went too far, which is doubtful and which we do not decide, it was not reversible error because there was no motion for a mistrial.

We next consider Rhodes' claim of reversible error based on the admission of three state court convictions: misdemeanor possession of less than one ounce of marijuana on February 12, 1981; misdemeanor possession of cocaine on April 9, 1980; and simple felonious possession of cocaine on November 1, 1983. Rhodes argues that admitting evidence of the three convictions was improper because it was irrelevant and, even if it was relevant on a disputed issue, it nevertheless was highly prejudicial because it depicted him as a bad person, drug user, and convicted drug offender. Specifically, Rhodes claims that the convictions were inadmissible under Rule 404(b) because there was no disputed issue concerning his motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. The trial judge, however, specifically stated that he was admitting the convictions because of the line of defense Rhodes had raised and that in his opinion the probative value of the convictions outweighed the prejudicial effect.

Rhodes was charged in Count 1 with conspiring with others to possess and distribute cocaine and marijuana from August 1978 through April 1980. The government charged as a manner and means of the conspiracy that three individuals, not including Rhodes, were involved in a four kilogram cocaine transaction in November 1979. While the indictment charged Rhodes specifically with conspiracy to possess and distribute cocaine and marijuana, it did not otherwise charge or connect Rhodes to any specific cocaine transaction.

Notwithstanding Rhodes' apparent lack of involvement in the specific cocaine transaction charged as a manner and means of the conspiracy, it was the government's theory that the cocaine transaction was undertaken to generate money to cover the expenses for an upcoming marijuana transaction. The indictment charged Rhodes with participation in the subsequent marijuana transaction. Rhodes maintains that since the government was able to tie the cocaine and marijuana operations into one conspiracy and since there was no proof that Rhodes was involved in the four kilogram cocaine sale, the government introduced the two cocaine convictions so that the jury would think that Rhodes nevertheless was involved in the November 1979 cocaine transaction. Such admission, Rhodes asserts, was improper under Rule 404(b) since his defense was not lack of knowledge or intent, but, rather, that he was not involved in the specific four kilogram transaction. Moreover, he claims that he was prejudiced by the introduction of the cocaine convictions, which were subsequent in time to the 1979 cocaine transaction and involved only possession of cocaine. He argues that, even though the government could not prove his involvement in the large cocaine distribution transaction, the jury could infer on the basis of his past cocaine possessions that he was involved in it. Similarly, Rhodes contends that it was improper to admit the misdemeanor marijuana conviction because his defense was not lack of motive, intent, or knowledge regarding the charges against him for marijuana possession and distribution. As with the cocaine charge, Rhodes argues that his defense on the marijuana charges was that he did not participate in the specific acts.

During opening statements, counsel for Rhodes depicted Rhodes as a professional gambler who sought to ingratiate himself with people who had money so that he could win their money by gambling. Counsel painted Rhodes as never an organizer or importer of drugs and proposed that he merely stayed around to collect from those

who owed him gambling debts.[4] Throughout presentation of the government's case-in-chief, Rhodes' counsel on cross examination raised the issue of Rhodes' involvement with cocaine. For example, on cross examination of Rocky Townsend, counsel asked, "You've never known Mr. Rhodes to be involved in any cocaine transaction whatsoever, have you?," and the witness responded "No." Similarly, on cross examination of Dorothy Hodges, counsel asked "You've never known Mr. Rhodes to be involved in any cocaine distribution at all, have you?," to which the witness responded, "Not a large amount, no." Upon further questioning concerning Hodges' knowledge of Rhodes' involvement with cocaine, Hodges responded that she had obtained a gram or two of cocaine from Rhodes. Counsel also cross examined Jorge Aragon and Jeffrey VanMeter on the matter of Rhodes' involvement with cocaine. Aragon stated that he had never been involved in a cocaine transaction with Rhodes, and VanMeter testified that he had never known Rhodes to sell and distribute cocaine.

■ We think that the cocaine convictions were properly admitted under FRE 404(b) and that the district court did not abuse its discretion in determining that the probative value outweighed the prejudicial effect. Rhodes defended himself on the ground that as a professional gambler he merely associated with the real drug conspirators so they could gamble away their drug money. He consistently questioned the government's witnesses concerning their knowledge of his involvement with cocaine in an attempt to divorce himself from connection with the drug. To the extent then that Rhodes defended on the ground that he was present but innocent, he placed his intent in issue. By asking government witnesses whether they had ever known him to be involved with co-

caine, the cocaine convictions became admissible to contradict the attempt to disassociate Rhodes from connection therewith. We think that under the liberal construction lately given by this circuit to Rule 404(b) and like theories, it was not reversible error to admit the cocaine convictions on the issue of Rhodes' intent. *See United States v. Hadaway,* 681 F.2d 214 (4th Cir. 1982); *United States v. Masters,* 622 F.2d 83 (4th Cir.1980); *United States v. DiZenzo,* 500 F.2d 263 (4th Cir.1974); *United States v. Woods,* 484 F.2d 127 (4th Cir. 1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974).

Additionally, we find that the marijuana conviction was properly admitted. The conviction was based on the discovery of marijuana that police officers found in a drain in Rhodes' garage during the course of lawful search on March 22, 1980. This search, as we will describe more fully below in relation to the Fourth Amendment claim, uncovered a spiral notebook with names and figures which the government at trial introduced to show that Rhodes was in fact in the drug business and was involved with Cheek in such. The officer who conducted the search of Rhodes' house and garage testified as to what he found on the premises. We agree that admitting proof of the conviction was admissible under Rule 404(b) since Rhodes' defense that he was present but innocent placed his intent with respect to marijuana in issue. Moreover, we do not think that the trial court abused its discretion in ruling that the probative value outweighed the prejudicial effect.

## REMAINING ISSUES

■ During a search of Rhodes' house on March 22, 1980, police officers seized a spiral notebook that allegedly contained drug business records which related to the

---

**4.** Just as an opening statement does not make admissible evidence to contradict it, *see United States v. Basic Construction Co.,* 711 F.2d 570, 574 (4th Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 527, 78 L.Ed.2d 330 (1983), neither does it call for admitting bad acts of the defend-

ant into evidence. *United States v. Hadaway,* 681 F.2d 214, 218 (4th Cir.1982). But an opening statement as here certainly may be taken into account by the trial court in ascertaining a theory of defense.

dealings between Cheek and Rhodes on the November 1979 marijuana importation. The search was conducted pursuant to a search warrant which authorized seizure of certain containers of brown vegetable material and rolling papers. At the suppression hearing, Officer Hamilton testified that the closed notebook was next to some marijuana on a kitchen counter and that he picked it up and flipped through the pages. The notebook contained names, numbers, and figures. Hamilton testified that he looked at the notebook because, based on his experience as a law enforcement officer, he was aware that drug dealers customarily kept records of their drug dealings. The government maintains that the seizure was justified under the plain view exception to the warrant requirement since the search warrant did not extend to authorize seizure of the notebook. The government further contends that admission of photocopies of the notebook's contents was proper under FRE 1003 and 1001(4). We agree that under the authority of *United States v. Crouch*, 648 F.2d 932 (4th Cir.), *cert. denied*, 454 U.S. 952, 102 S.Ct. 491, 70 L.Ed.2d 259 (1981), the seizure of the notebook was justified by the plain view exception and that photocopies of the contents of such were admissible. Upon such a finding, we need not decide whether Cheek had a protectable privacy interest in the notebook seized from Rhodes' house.

Rhodes separately alleges that it was error for the court to admit a statement Rhodes made allegedly during the course of custodial interrogation. When Officer Hamilton picked up the spiral notebook during the search of Rhodes' house, Rhodes said, "You can't take that." Hamilton then asked, "Why," to which Rhodes responded, "I can't run my business without that." Rhodes moved to suppress the second statement on the ground that his response to Hamilton's question "Why" amounted to custodial interrogation. Since he had not been given his warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Rhodes claims that the statement should have been suppressed. The government claims that the

statement was admissible because Rhodes was not in custody at the time and because no interrogation occurred.

We do not need to decide the issue whether Rhodes' statement was made while he was "in custody," *see Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (U.S.1984), because we think the district court correctly determined that Rhodes made a spontaneous statement which was not the product of interrogation. Before Rhodes told Officer Hamilton that he could not have the spiral notebook, Hamilton had had no communication with Rhodes beyond reading the search warrant to him. It is apparent that the police officer did not initiate the conversation that ensued. Viewing the context within which Rhodes made the statement he now seeks to suppress, we agree that Rhodes' response was spontaneous and not the product of interrogation. Thus, we find that the statement was admissible and follow the reasoning of *United States v. Grant*, 549 F.2d 942, 946 (4th Cir.), *cert. denied*, 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977), where we stated that *Miranda* does not protect an accused "from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers."

We have considered the other assignments of error and find them to be without merit.

Accordingly, the judgment of the district court is

**AFFIRMED.**