**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Arlin Ernest WRIGHT, Jr.,**
**Defendant–Appellant.**

**No. 92–5335.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 4, 1992.

Decided April 19, 1993.

Andrea Celestine Long, Boone, Beale, Carpenter & Cosby, Richmond, VA, argued, for defendant-appellant.

Julie Marie Campbell, Asst. U.S. Atty., Abingdon, VA, argued (E. Montgomery Tucker, U.S. Atty., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, WILKINS, Circuit‘Judge, and MORGAN, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Arlin Ernest Wright, Jr. appeals his conviction by the United States District Court for the Western District of Virginia entered on February 26, 1992. Wright was charged with violating 26 U.S.C. § 5861(d) and § 5871, both firearms provisions, and 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(vii), both controlled substances provisions. He raises four issues on appeal: (1) whether the district court erred in overruling Wright's motion to suppress all of the evidence obtained in the search of his home because the basis of the search warrant was obtained through an illegal search; (2) whether the district court erred in overruling Wright's motion to suppress his statement regarding the purchase of the firearm; (3) whether there was sufficient evidence to support the possession element of the marijuana distribution count; and (4) whether the district court erred in finding Wright guilty of possession of an unregistered firearm even though the firearm was not operational. Finding no merit in any of Wright's claims, we affirm the judgment of the district court.

### I.

Arlin Wright resided in southwestern Virginia on the edge of the Jefferson National Forest. On July 17, 1990, state and local law enforcement agencies were engaged in marijuana eradication efforts in the Jefferson National Forest. Overhead aerial surveillance revealed a marijuana plot and guided the coordinated police ground forces to Wright's property. The marijuana plot actually was located in the neighboring national forest, however, Wright's driveway was the most direct route to the marijuana. When the drug eradication team reached Wright's driveway, it found a gate across it secured with a chain. After determining that the gate had been placed on federal property, they cut the chain that secured the gate. The police units entered Wright's property and secured the area, ordering Wright to control his dog. The police units informed Wright that they were on his property in order to eradicate marijuana growing very close to his property in the neighboring national forest.

The police observed that the marijuana plots had well-worn foot paths leading to them from Wright's driveway. The closest marijuana plot was approximately 150–feet from Wright's home. There were no other foot paths leading directly to the marijuana plots other than those from Wright's property and ones connecting the various plots to each other.

The police destroyed approximately 1,666 marijuana plants. During the eradication process the police discovered some freshly cut plants along one of the paths. The police examined the area along the foot paths to determine if there were any more freshly cut plants. State Trooper R.D. Williams walked over Wright's property following another trail and passed by a barn with a loft. He peered in the stalls in the lower level of the barn, which were in plain view. Trooper Williams then walked up a set of six outside steps to the loft where the door was open with keys hanging out of the lock. Without entering the loft the trooper could see reflective insulation with greenish plant material around it, fluorescent lights, and skylights. He also noticed that an electrical power line ran to the barn from the house. Upon entering the loft Trooper Williams took samples of pieces of marijuana plants and plant residue.

Williams relayed his findings to Special Agent Gary Hall who then asked Wright if the police could search his home. Wright denied the agent's request; Agent Hall left the scene to secure a search warrant for Wright's house. While Hall was absent someone in Wright's home lit a fire in the heat stove and the water pump operated continuously. After Agent Hall secured a search warrant, a full search was conducted. The police instructed Wright and his family to remain in the house during the search. While searching Wright's bedroom Agent Hall discovered a short barrel Mossberg rifle in a table next to Wright's bed. Wright voluntarily stated that the rifle was his and that he had purchased it from

Chucky Stanley. He further stated that he had given the gun to his youngest son Nathan.

Agent Hall also discovered numerous personal papers in a lock box in Wright's bedroom, including an invoice for a six-hundred watt light bulb and phone bills for two separate phone numbers. Near the lock box was a flier from Superior Growers Supply concerning how to design a growth room. Wright's other son, James, later testified that those were his things. Agent Hall was aware that Superior Growers Supply sold products to persons in the marijuana producing business and that one of the phone bills contained three phone calls to a marijuana seed distributor in The Netherlands. The search of the house also revealed four foot-long fluorescent lights that are commonly known as drying lights. Based on this evidence Wright was subsequently indicted on four counts.

Prior to trial Wright sought to have the evidence found inside the barn suppressed, claiming that it was the product of an illegal search. Wright also sought to have the evidence obtained in his house suppressed because he contended that the search warrant was not based on sufficient probable cause, but issued based on illegally obtained evidence. The district court granted the motion in part and denied it in part. The court determined that the evidence Trooper Williams obtained by peering into the barn's loft was admissible, but the evidence he obtained by entering the barn's loft was inadmissible. The court held that there was sufficient probable cause for the search warrant to be issued even absent the tainted evidence.

Wright was convicted of count one, knowingly manufacturing or possessing with intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(vii), and count three, knowingly possessing a firearm which was not registered as required by 26 U.S.C. § 5841, in violation of 26 U.S.C.

§ 5861(d) and § 5871.* He was sentenced to 120 months on count one and 121 months on count three, the sentences to run concurrently.

## II.

Wright asserts that the district court committed four errors. We will address each in turn.

### A

Wright contends that the district court erred by not suppressing the evidence obtained in the search of his home and by not suppressing the search warrant. The district court granted Wright's motion to suppress the evidence in part, and denied it in part, holding that the evidence obtained by the trooper entering the barn should be excluded.

 This case is similar to that of *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1984). The defendants in *Dunn* claimed that the police peering in windows of their barn in search of drugs and drug paraphernalia violated their Fourth Amendment rights. *Id.* at 301, 107 S.Ct. at 1139. The *Dunn* Court held that a barn sixty yards from the residence was not within the curtilage of the residence. The concept of curtilage arises from the common law and extends protection to the area surrounding a person's home. The Court established a four-factor test to determine whether an out-building was within the home's curtilage. The Court opined that courts should examine:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301, 107 S.Ct. at 1139. These are not bright line rules designed to yield a correct

---

* Wright was acquitted of count two, possession of a firearm not registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(i) and § 5871. The court dismissed count three that on July 17, 1990 he knowingly possessed with intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(vii).

answer when mechanically applied, but are to be used as "analytical tools." *Id.*

 The district court correctly applied these factors and determined that Wright's barn was outside the curtilage of his home. Therefore, under *Dunn* the barn was like an "open field"—which includes any unoccupied or undeveloped area outside the curtilage—for purposes of deciding Fourth Amendment protection. As an open field, " 'the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the test of the Fourth Amendment' " *Id.* at 303–304, 107 S.Ct. at 1141 quoting *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

The court determined that Wright, however, had a reasonable expectation of privacy in his barn under *United States v. Bellina,* 665 F.2d 1335 (4th Cir.1981). In *Bellina* this court held that an officer's peering into the interior of a damaged plane from a step ladder did not constitute an unconstitutional search. *Id.* at 1343. Wright's reasonable expectation of privacy meant that the officer could not enter the barn without the benefit of a search warrant. The officer, however, could stand outside and peer into the barn through an open window or door.

 The observations that the trooper made by peering in the barn's open loft were admissible since the loft was open and not protected from public view. Evidence obtained in that manner was admissible in support of the search warrant. *Id.* The district court correctly held that the paths leading to the patches, the fluorescent lighting, the marijuana "pieces", reflective insulation, and other things found outside the barn were admissible to support the search warrant. The inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it under *United States v. Whitehorn,* 813 F.2d 646, 649 (4th Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 931 (1988). There was sufficient untainted evidence to support the warrant.

**B**

 Next, Wright contends that the court erred by admitting into evidence his statement that he owned the Mossberg rifle. Wright asserts that he was in a custodial situation and that *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), required that he be advised of his right not to make self-incriminating statements. In order for *Miranda* warnings to be necessary, the defendant must be in a custodial situation, and the statements must be made while the defendant is being interrogated. In *Rhode Island v. Innis,* the Supreme Court stated, " 'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' " 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (quoting *Miranda v. Arizona,* 384 U.S. at 478, 86 S.Ct. at 1629); *see also Estelle v. Smith,* 451 U.S. 454, 469, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981). The *Innis* Court held that when police conduct is reasonably likely to elicit a response, however, then *Miranda* warnings are necessary. *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689. We stated in *United States v. Rhodes,* 779 F.2d 1019 (4th Cir.1985) that spontaneous statements which were not the product of interrogation were not barred by the Fifth Amendment. *Id.* at 1032. In *Giarratano v. Procunier,* 891 F.2d 483 (4th Cir.), *cert. denied,* 498 U.S. 881, 111 S.Ct. 222, 112 L.Ed.2d 178 (1989) we reiterated that proposition, that even though the defendant was in custody, a prior threatening statement that he had made to a doctor was spontaneous and voluntary and therefore admissible. *Id.* at 488.

We do not need to determine whether Wright was in custody to decide this case. *See generally Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). The statements were completely voluntary; Wright uttered them as he watched his bedroom being searched. The uncontradicted testimony is that Wright was standing in the door and without provocation stated that he purchased the rifle from Mr. Stanley. The district court correctly determined that Wright's claim fails

because the statement was unsolicited and not made in response to any interrogation. *See Innis*, 446 U.S. at 298–299, 100 S.Ct. at 1688. Therefore, *Miranda* does not prohibit the introduction of the statement and its warnings were not necessary.

### C

■ Wright's third assignment of error is that the evidence presented was insufficient to convict him of possession with intent to distribute marijuana. He argues that the Government failed to produce any direct evidence linking him with the marijuana. Wright places significance on the fact that the marijuana was growing on public land and that three other adults in the house could have been responsible for its production. This claim is without merit.

■ The evidence must be viewed in the light most favorable to the Government. *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979). Possession of marijuana can be either constructive possession or actual. Constructive possession of a controlled substance exists when "the defendant exercises, or has power to exercise, dominion and control over an item" and it can be proven by circumstantial evidence. *United States v. Bell*, 954 F.2d 232, 235 (4th Cir.1992). This possession does not have to be exclusive, but can be shared with others. *Id.* Moreover, intent to distribute the controlled substance can be inferred if the quantity is larger than what normally would be consumed for personal use. *United States v. Fisher*, 912 F.2d 728, 730–31 (4th Cir.1990); *United States v. Roberts*, 881 F.2d 95, 99 (4th Cir.1989).

The direct foot paths leading from Wright's house and property to the marijuana plots furnish the most compelling evidence of guilt. The police officers who searched the area testified that no other paths leading to the plots were discovered. Furthermore, the closest plot was within 150 feet of Wright's house.

The search of his home and property also indicated that he was involved and controlled the marijuana production. The search revealed numerous items that are associated with growing marijuana. Growing lights, phone calls to a marijuana seed distributor, reflective insulation, a pamphlet on indoor plant growth, and a sky light in the barn loft were all indicative of marijuana production. The Government's witnesses testified that many of the items are associated with drug producers. The amount of marijuana discovered is clearly indicative that his intent was to distribute the contraband rather than use it for personal consumption.

A reasonable jury could determine that each of Wright's witnesses were not credible. Each witness testified as to who possessed a certain item or why an event occurred. Moreover, the jury could reasonably believe that Wright, rather than one of the other adults, was responsible for the marijuana production. Under these standards there was more than sufficient evidence for a reasonable fact finder to conclude that Wright was guilty of possession with intent to distribute marijuana.

### D

■ Wright's final assignment of error is that the district court erred in finding him guilty of possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d). The statute makes unlawful receiving or possessing any gun which meets the statutory definition of firearm that is not registered in the National Firearms Register. 26 U.S.C. § 5861(d). Wright rests his argument on three points, each of which is without merit.

Wright's first contention is that the firearm must be operational to be a "firearm" under section 5861(d). This is an issue of first impression in this circuit and there is limited authority on the question. In section 5845, the statutory definition of firearm, defines an unserviceable firearm as "a firearm which is incapable of discharging a shot by means of an explosive and incapable of being readily restored to a firing condition." Therefore, it seems to follow that a firearm that can be readily restored is a "firearm" for purposes of section 5861(d). The Fifth Circuit reached

a similar conclusion in *United States v. Woods*, 560 F.2d 660, 664–665 (5th Cir. 1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978). The evidence in the instant case indicates that for less than twenty dollars the rifle could be made operational. Moreover, a Government witness testified that the insertion of an ordinary paper clip in the firing mechanism also would make the rifle operational.

▮ Wright's second contention is that evidence showed that he was not in possession of the weapon because two family members, one being his son Nathan, testified that the weapon belonged to Nathan. This argument overlooks the obvious point that Wright voluntarily stated that he purchased the weapon and then gave it to his son. This is adequate to demonstrate that he received and possessed an unregistered firearm which is all that is required under section 5861(d).

Wright's final argument is that he could reasonably believe that this was a pistol rather than a rifle and therefore he was not required to register it as a firearm. Section 5861(d) does not establish a specific intent crime requiring the defendant to know that it was unlawful to possess the weapon; but it is a strict liability crime. *United States v. Mayo*, 705 F.2d 62, 78 (2d Cir.1983). Therefore, Wright's lack of knowledge is inconsequential.

### III.

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED.