In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2654

Robert Siebert and Pamela Siebert,

Plaintiffs-Appellants,

v.

David Severino,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois, Peoria Division.
No. 98 C 1411--Michael M. Mihm, Judge.

Argued December 7, 2000--Decided July 6, 2001


   Before Bauer, Manion, and Rovner, Circuit
Judges.

   Manion, Circuit Judge.  David Severino,
a volunteer investigator for the Illinois
Department of Agriculture, seized three
horses owned by Pamela Siebert, after
having searched a barn owned by Pamela
and her husband Robert. After the
Sieberts got the horses back, they sued
Severino under Section 1983, alleging
that he violated their Fourth Amendment
right to be free from unreasonable
searches and seizures and deprived them
of their property--three horses--without
due process of law. The district court
granted Severino summary judgment. The
Sieberts appeal, and we reverse.

I.  Background/1

   Robert and Pamela Siebert own and reside
on property in rural Carlock, Illinois.
Their home and barn are situated on a
four and one-half acre site. The barn,
which is located approximately sixty feet
from their house, is surrounded by a
fence. Also inside the fence are a riding
area, turn-outs, and a paddock. The
horses are free to go in and out of the
barn at will. About a five-minute walk
from their own property is a seven-acre
pasture owned by their friend and
neighbor Deb Oberg. Ms. Oberg agreed to
allow the Sieberts to turn out their
horses on her pasture in exchange for

their keeping up the area. This pasture is very hilly and has a stream running through it.

   The Sieberts, who at the relevant time owned seven horses, kept three in Oberg's pasture and four in their own fenced-in riding and barn area. They also rotated the horses at times, bringing the three in from the pasture and turning out the others. The three horses kept in the pasture were fed twice a day; the Sieberts would tie buckets of grain to the fence posts and throw hay on the ground for them to eat. Water for the horses came from the creek that runs through the pasture, and in the winter, if the creek froze, Robert would break the ice with an ax handle. While there are no significant man-made shelters on the property, there are abundant trees and steep slopes which establish a windbreak for the horses. The Sieberts have kept horses at this location for approximately 15 years, and Pamela has extensive experience with horses and is knowledgeable about their needs and care.

   On December 16, 1996, David Severino, who is a volunteer for the Illinois Department of Agriculture, received a complaint that the Sieberts' horses were in a fenced area with no shelter or water. In response, Severino entered the Sieberts' fenced-in paddock and turn-out area without a search warrant to inspect the horses. He also entered the Sieberts' barn where the feed and hay were kept, taking a sample of each. In addition he entered and inspected Ms. Oberg's property where the three horses were located. On the day he went to the Sieberts', the temperature ranged from 28 to 42 degrees, and there was abundant dry ground in the Oberg pasture that was easily accessible by the horses. Before leaving the Sieberts', Severino taped a Notice of Apparent Violation on the door to their house. The notice stated that the Sieberts had failed to provide the horses in the pasture with adequate shelter and protection from weather and had failed to provide them with humane care and treatment. It also stated that the horses were standing in mud and that there were no dry areas for them to stand and that they were drinking from the creek. The notice gave the Sieberts 72 hours to take corrective action.

When the Sieberts discovered the notice, they drove to Severino's house to discuss the situation with him, but he was not home. The next day, Pamela called Severino's office to arrange a meeting. Severino was not at the office, so Pamela explained the situation to the person who answered the phone for Severino. Pamela said that she would move the horses to the barn right away, if that was what she had to do. A person named "Leah" at Severino's office instructed Pamela to leave the horses where they were-- describing the layout as "a beautiful place" and "perfect . . . for horses"-- and to await a call from Severino. Severino never returned the call, even though Pamela provided Leah with "all the numbers I could think of wherever I would be." Instead, on December 19, he returned to their home with several police officers to seize the horses. He tried to put the three horses in a two-horse trailer, but not surprisingly had problems. One of the Sieberts' neighbors went over to help when she saw that Severino and the officers could not control the horses and were hitting them to get them inside the trailer. Somehow they succeeded with this venture and before leaving, they gave the Sieberts' son a Notice of Impoundment. The horses were taken to a barn where the Sieberts later found them to be without water and with a mare and stallion together in the same stall. Over the next two days, Pamela met with Severino and had various conversations concerning the horses. Apparently, Severino agreed to return the horses if they built a "stall," which they did literally overnight, as by December 21, 1996 all three horses were returned to the Sieberts. (Presumably this so-called stall was some kind of free-standing shelter or shed.)

After the Sieberts' horses were returned, they sued David Severino and the officers involved under Section 1983, alleging that the defendants violated their Fourth and Fourteenth Amendment rights. They also asserted a state law claim for trespass. All of the defendants, other than David Severino, were dismissed from the case, and then the parties engaged in discovery. During discovery, the Sieberts learned that Severino had told Chet Boruff, the Deputy Director of the Department of Agriculture, that the horses were kept in

a confined, muddy area, were emaciated, near death, in danger, and needed to be removed immediately. However, as noted above, the horses were not kept in a confined, muddy area and were well-fed, and Severino does not now contend otherwise.

Following discovery, Severino moved for summary judgment on the constitutional claims. The district court granted that motion. The district court also dismissed the Sieberts' state law trespass claim, concluding that a state Court of Claims had exclusive jurisdiction over it. The Sieberts appeal from the district court's summary judgment ruling on the constitutional claims, but do not challenge the dismissal of the state law trespass claim.

II. Analysis

A. Fourth Amendment

The Sieberts sued Severino under Section 1983 for violating their Fourth Amendment rights, as incorporated by the Fourteenth Amendment. Actually, the Sieberts present two distinct Fourth Amendment claims: First, they contend that Severino violated their Fourth Amendment right to be free from unreasonable searches by entering and searching their barn; and second, they claim that Severino violated the Fourth Amendment's prohibition of unreasonable seizures by seizing the three horses without a warrant and without exigent circumstances.

1. The search of the barn.

It is undisputed that Severino entered and searched the Sieberts' barn. He did not have a warrant to do so. Severino contends that he did not need a warrant because the barn was not within the curtilage of the Sieberts' home, and therefore it was outside the protection of the Fourth Amendment. The Sieberts concede that their barn, which is about 60 feet from their home, was outside the curtilage of their home, but maintain that because they had an expectation of privacy in the barn, it is still protected by the Fourth Amendment.

The Fourth Amendment protects persons against unreasonable searches and

seizures of their "persons, houses, papers, and effects." Both a home and the home's curtilage--i.e., "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home"--are within the scope of the Fourth Amendment's protection. United States v. Shanks, 97 F.3d 977, 979 (7th Cir. 1996) (quoting United States v. Pace, 898 F.2d 1218, 1228 (7th Cir. 1990)). Thus, the government cannot search this area absent a warrant (or some exception to the warrant requirement). But if a search occurs outside the home or the home's curtilage--even if it is on private property--the Fourth Amendment's guarantee applies only if the property owner has a legitimate expectation of privacy in the area. This is because the Supreme Court has rejected a property-line approach to the Fourth Amendment, concluding instead that the government may enter a person's private property (outside of the curtilage) and conduct a warrantless search, unless that individual has a legitimate expectation of privacy in the property searched. Id.

Thus, the question presented on appeal is whether the Sieberts had a reasonable expectation of privacy in their barn. They did. The barn was within 60 feet of their home. It had doors on it, which they often kept locked, and it was located in a fenced-in area of their property. Severino contends that the Sieberts did not have an expectation of privacy in the barn because they were not engaged in intimate activities in the barn. But how did he know that without first going inside? In fact, Severino entered the premises in response to a report of animal abuse. Such an enclosed structure is a typical location for a property owner to engage in private activities. Curious friends and neighbors, much less a government agent with a mission, would be expected to keep out. See, e.g., United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (holding that there was a legitimate expectation of privacy inside a barn).

Severino cites United States v. Dunn, 480 U.S. 294, 300 (1987), wherein the Supreme Court held that, even without a warrant, the police could constitutionally stand outside a barn and

"peer[ ] into the barn's open front." But Dunn did not hold that the police could enter the barn itself. Id. at 303. The Fourth Circuit noted that distinction in Wright, when holding that a landowner had a legitimate expectation of privacy in a barn and therefore the Fourth Amendment prevented the police from entering the barn without a warrant. Severino didn't just peer in--he went inside, searched the premises and inspected the feed and hay stored inside. See, e.g., Kyllo v. United States, 99-8508 at 4 n.1 (June 11, 2001) ("When the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as to search the house for a book; to search the wood for a thief.'") (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed. 1989)).

Alternatively, Severino argues that even if the Sieberts had a reasonable expectation of privacy in their barn, the law was not clearly established at the time that he searched their barn and therefore he is entitled to qualified immunity. Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A violation may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, or if a closely analogous case establishes that the conduct is unconstitutional. Brokaw v. Mercer County, 235 F.3d 1000, 1022 (7th Cir. 2000).

This case seems to fit within the "obvious" scenario--a reasonable state actor would know that he cannot enter a fenced-in, closed structure located within 60 feet of a person's house without a warrant or some exception to the warrant requirement. But even if not reasonably obvious to Severino, a closely analogous case indicates that his conduct was unconstitutional: his search took place in 1996, and less than three years earlier the Fourth Circuit held that

citizens enjoy an expectation of privacy in their barn. See Wright, 991 F.2d at 1186./2 Therefore, Severino is not protected by qualified immunity.

Even if Severino nosed around in the Sieberts' barn, there appears to be little or no damage, so what's the harm? The harm is that Severino violated the Sieberts' constitutional rights. Had the Sieberts been doing something illegal in the barn and Severino's search uncovered evidence, the Supreme Court mandates that such evidence be excluded (unless, of course, there is some exception to the exclusionary rule). In the criminal context, the evidence is excluded even though it might otherwise be used to convict the accused. But the Fourth Amendment does not only protect people accused of crimes. The law recognizes that law-abiding citizens can sue and recover general (or presumed) damages for a Fourth Amendment violation, even without proof of injury. Hessel v. O'Hearn, 977 F.2d 299, 301 (7th Cir. 1992)./3 Additionally, punitive damages are recoverable under Section 1983 even in the absence of actual damages where the jury concludes that the defendant's conduct was "motivated by evil intent or involv[ed] reckless or callous indifference to the federally-protected rights of others." Erwin v. County of Manitowoc, 872 F.2d 1292, 1299 (7th Cir. 1989). In the end, it will be for the jury to decide the proper quantum of relief, if any, for Severino's violation of the Sieberts' Fourth Amendment rights.

2.   The seizure of the horses.

The Fourth Amendment also protects against unreasonable seizures. Pamela contends that Severino violated her Fourth Amendment rights when he seized her three horses. Initially, we note that because Robert admitted that he did not own the horses, and that the papers for the horses were all in Pamela's name, Robert lacked standing to sue. Cf. Perry v. Village of Arlington Heights, 186 F.3d 826, 829-30 (7th Cir. 1999) (plaintiff lacked standing to challenge the constitutionality of the seizure and disposal of abandoned automobiles pursuant to the Illinois Motor Vehicle Code, where the plaintiff did not own an automobile). Pamela's Fourth Amendment

claim based on the seizure remains, and so we address that.

Specifically, Pamela contends that because Severino seized the horses without a warrant, he violated her Fourth Amendment rights. The removal of an animal constitutes a "seizure" for purposes of the Fourth Amendment, and thus such a seizure must meet that Amendment's constitutional requirements. See, e.g., Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994). Generally, the government needs a warrant to seize property, and as we have noted, Severino did not possess a warrant justifying the seizure./4

Severino argues that he did not need a warrant to seize the horses under the Illinois Humane Society Act. Specifically, he relies on Section 11 of the Act which does not require an investigator to obtain a warrant, requiring only that the investigator "contact the Department [of Agriculture] and request authorization to impound the animal or animals . . . ." 510 ILCS 70/11(b). The Act provides that "[t]he Department will authorize the impoundment if a review of facts gathered by the humane investigator indicates a violation of Section 3 . . . has occurred and the violator . . . has failed or refused to take corrective action. . . ." Id. Section 510 ILCS 70/12(a) similarly provides that if the owner fails to take the necessary corrective action, the Department of Agriculture may authorize a humane investigator to impound the animals in a facility which will provide good care.

Severino's reliance on these provisions is misplaced for two alternative reasons. First, Section 70/11(b) mandates that the humane investigator contact the Department of Agriculture and request authorization to impound the animals, but in his affidavit, Severino stated that he did not speak with Chet Boruff, who was the Deputy Director of the Department of Agriculture, "until after the incident and [after] I had taken custody of the horses." Read in the light most favorable to the Sieberts, this indicates that Severino failed to obtain the statutorily required authorization to impound the horses. Therefore, he cannot rely on the statute to justify the warrantless

seizure of the horses.

Alternatively, if Severino did in fact obtain permission to impound the horses from the Department of Agriculture, the record (again read in the light most favorable to the Sieberts) indicates that the Department authorized the animals' seizure based on Severino's misrepresentation of their condition. Specifically, Deputy Director Boruffindicated that Severino had said that "the animals were in, oh, a near death situation, . . . and that they were in danger and they needed to be gotten out of there immediately . . . ." Moreover, Pamela stated in her deposition that when Deputy Director Boruff came to view her property, he asked her where the fence was, and she had asked "What fence?" To which Boruff responded, "The fence that kept them right in that area where the mud was." After Pamela explained that there was no fence and that he could go look for holes, Boruff said, "well, it was [my] understanding that the horses were kept in a very small area and couldn't leave the mud." But the record demonstrates that these representations were false; the horses were not confined in a small, muddy area and they were not near death./5 Thus, even if Severino sought and obtained authorization from the Department of Agriculture under Section 70/11, he cannot seek refuge in that statute because viewing the record in the light most favorable to the plaintiffs indicates that Severino obtained permission to impound the animals only because he misrepresented their condition to the Department of Agriculture./6

Severino argues alternatively that he was entitled to seize the horses based on exigent circumstances. Exigent circumstances may justify a warrantless seizure of animals. See, e.g., DiCesare v. Stuart, 12 F.3d 973, 977 (10th Cir. 1993). Severino claims that this is such a case and points to his original Notice of Apparent Violation which stated that the animals were standing in mud, kept outside in the cold and were drinking from a stream. Under these stated conditions, however, not only were the animals not in imminent danger, they were not in any danger at all. As the record establishes, the three horses were kept on a seven-acre pasture which while in

parts was muddy, offered many dry standing areas. But horses, being horses, may prefer standing in the mud from time to time. And no doubt horses have been drinking out of streams long before humans harnessed and saddled them. This leaves the only remaining basis asserted of exigent circumstances--that the horses were kept outside in the cold. That too is ordinary and natural, even in the winter months. Although horses that are regularly turned out in pastures adjust to and thrive in cold weather, as with any animal, extreme cold can causesuffering, even death. But temperatures ranging in the 20's and 30's are not dangerous for healthy animals used to being outside. In any event, Severino could not have thought that the horses were faced with imminent harm because he left them at the Sieberts' for three days after his initial search.

Alternatively, Severino argues that while the circumstances originally may not have justified the seizure, by the time of his second visit the temperature had dropped to between 4 and 14 degrees, and therefore exigent circumstances justified his seizure at that time. While such temperatures may seem cold to the untrained layman, a supposedly informed worker at the Department of Agriculture would know that horses grow longer and thicker hair to accommodate the cold weather; that horses take advantage of natural windbreaks, such as the trees and steeply sloped hills and almost vertical bluff landscaping the seven-acre Oberg pasture; and that as long as the animals have adequate food and water, they get along fine in such temperatures. As the record shows, such conditions are not dangerous or inhumane, and thus do not create exigent circumstances. Specifically, Pamela Siebert testified in her deposition that she had extensive experience with horses and is knowledgeable about meeting their needs and caring for them, and that the care she and her husband provided conformed to the custom and practice in the horse trade. She further explained in the deposition that she verified her own expertise on caring for horses by referring to well-known horse periodicals and books, and that these in fact confirmed that the conditions suited the needs of horses. Severino did not present any evidence to contradict Pamela's

testimony. Nor is there any evidence in the record supporting Severino's contention that 4-14 degrees is too cold for horses to be kept safely outdoors. Moreover, the record fails to show that Severino had any knowledge about the appropriate care for horses, much less any expertise about horses in general, such that his view that it was too cold to keep horses outside isn't worth any weight whatsoever. In fact, given that Severino placed three horses in a two-horse trailer and then boarded a mare and a stallion in the same stall, the most reasonable inference is that Severino had little knowledge as to how to care for horses./7 Furthermore, if the cold were of concern, rather than seizing them, Severino could easily have moved the horses to the barn where Pamela's other horses were. After all, he had already checked out the barn and apparently found it satisfactory. There is yet another reason why Severino's seizure was not reasonable--his office (a woman called Leah) informed Pamela not to move the horses, and under these circumstances it was unreasonable for him to seize them without attempting to return the Sieberts' telephone call.

Once again, Severino asserts the defense of qualified immunity, arguing that he reasonably believed that exigent circumstances justified the seizure of the horses. The first question, given the conditions he found during the initial inspection, is whether a reasonable officer could have mistakenly believed that exigent circumstances existed justifying the warrantless seizure. Cf. Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998). We reject this argument because the record evidence demonstrates that a reasonably informed governmental worker authorized to ensure humane care would know that temperatures between 28-42 degrees, or even 4-14 degrees, do not constitute exigent circumstances justifying a warrantless seizure of horses. The second question raises more of a concern. Even if a reasonable humane care worker could believe exigent circumstances justified the seizure of the horses, in this case, the evidence presented at summary judgment indicates that Severino either greatly exaggerated the condition of the horses and the premises to the Department of Agriculture in order to obtain permission to seize

them, or did not contact the Department of Agriculture (as required by statute) until after he impounded the horses. In either case, this precludes a defense of qualified immunity. Cf. Brokaw, 235 F.3d at 1022 ("It is clearly established law that a government official's procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment.") (internal quotation omitted).

B.  Due Process

   Pamela's final claim is a due process claim. She argues that Severino violated her right to procedural due process by removing her horses without providing her with a predeprivation hearing./8 A "procedural due process [claim] requires a two-step analysis. First, we consider whether the plaintiff was deprived of a constitutionally protected interest in life, liberty or property. If [s]he was, we then determine what process [s]he was due with respect to that deprivation." Porter v. DiBlasio, 93 F.3d 301, 305 (7th Cir. 1996). Clearly, Pamela's ownership interest in the three horses is a protected property interest under the Fourteenth Amendment. Id.

   Because Pamela was denied her property, we must now consider the constitutionally required process corresponding to the removal. "Due process requires that a person not be deprived of property without notice and an opportunity for a hearing." United States v. Michelle's Lounge, 39 F.3d 684, 697 (7th Cir. 1994). Absent exigent circumstances, or a random or unforeseen act, a pre-deprivation procedure is generally required before the government may deprive a person of their property. Zinermon v. Burch, 494 U.S. 113, 132 (1990); Logan v. Zimmerman Brush Co., 455 U.S. 422, 436 (1982). Moreover, "the requirement of due process, including a pre-deprivation hearing where feasible, applies to temporary as well as to permanent deprivations." Penn Cent. Corp. v. U.S. R.R. Vest Corp., 955 F.2d 1158, 1162 (7th Cir. 1992). Therefore, we must determine whether the general rule mandating a pre-deprivation hearing applies, or whether a post-deprivation hearing would suffice to satisfy due process in this case.

Initially, we note that Severino does not argue that his actions in directing the removal of the horses were random or unforeseen. Nor were the circumstances (as they existed, not as Severino may have exaggerated) so exigent as to have justified dispensation of the pre-deprivation hearing. See supra at 12 - 14 (discussing lack of exigent circumstances in context of the Fourth Amendment). Thus, a pre-deprivation hearing is seemingly required. Yet even in the absence of those "enumerat[ed] discrete exceptions to the requirement of pre-deprivation process," Penn Central, 955 F.2d at 1164, under Mathews v. Eldridge, 424 U.S. 319, 335 (1976), we must still ask "whether, all things considered, predeprivation process is a reasonable requirement to impose. That depends on the balance between the benefits and the costs of such process." Penn Central, 955 F.2d at 1163.

In weighing the costs and benefits, the Supreme Court has set forth three considerations:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interests, including the function involved and the fiscal and the administrative burdens that the additional or substitute procedural requirement would entail.

Mathews, 424 U.S. at 335.

As to the first consideration, "there can be no dispute that an animal owner has a substantial interest in maintaining his rights in a seized animal. Such is especially the case with potential income-generating animals such as horses, cattle, swine, and the like." Porter v. DiBlasio, 93 F.3d 301, 306-07 (7th Cir. 1996)./9 Animal owners also have a substantial interest in their "mere" pets, and while the value of pets is different from income-generating animals, it is not necessarily lesser. Id. Second, the risk of an erroneous deprivation of Pamela's interest in her horses through the procedures used is great, as the reality of this case demonstrates. The

state used a volunteer investigator who apparently lacked sufficient knowledge about horses to determine whether appropriate care was given, and the procedures failed to provide the Sieberts with the opportunity to discuss the situation before the animals were removed. Moreover, the procedure used in this case allowed Severino to exaggerate the conditions he encountered in discussing the situation with the Department of Agriculture, and some sort of pre-deprivation hearing would have prevented or reduced the chance of an erroneous deprivation based on such misrepresentations.

As to the final factor, "the Government's interests" and "the fiscal and the administrative burdens that the additional or substitute procedural requirement would entail," we note that it would not be much of a burden for the government (in non-exigent circumstances) to allow animal owners to tell their side of the story before their animals are seized. After all, Severino waited 72 hours before seizing the horses and during that time the Sieberts contacted his office in order to discuss the situation, demonstrating the feasibility of pre-deprivation process. That is not to say that a full-blown hearing is required, Penn Central, 955 F.2d at 1162, but at a minimum Pamela had the right to some sort of pre-deprivation opportunity to be heard. Of exactly what sort, we need not decide. It may well be that had Severino met with Pamela, allowing her an opportunity to present her side of the case, that would be enough. We need not reach this question, however, because in this case not only did Severino never meet with Pamela before he took the horses, but his office expressly told Pamela not to remove the horses from the pasture and that he would contact her. But Severino never did, instead removing the horses the next day. Under these circumstances, we conclude that Pamela has presented sufficient facts to support a due process claim based on the horses' removal without a pre-deprivation hearing./10

Severino is also not entitled to qualified immunity on this claim because it has been clearly established since at least Logan, 455 U.S. 422, that unless pre-deprivation relief is impractical, it

must be provided. While acknowledging that it was clearly established that a pre-deprivation hearing is required absent an emergency situation or a random and unauthorized deprivation, the district court nonetheless concluded that Severino was entitled to qualified immunity because the Illinois Humane Care for Animals Act only provided post-deprivation process, reasoning that Severino could reasonably believe that that was all that was constitutionally required. But it may well be that the reason the Illinois Humane Care for Animals Act only requires post-deprivation process is because the Department of Agriculture will only authorize a pre-hearing seizure in exigent circumstances. See supra at 12. In that case, the seizure would be constitutionally justified even though there was no pre-deprivation hearing. But the record creates the inference that Severino either did not contact the Department of Agriculture until after the fact or provided it with false and misleading information in order to obtain permission to impound the horses, which the Department may have relied on in ordering the seizure of the horses. Under either scenario, Severino failed to comply with the Illinois Humane Care for Animals Act, so that statute cannot provide him with a basis for qualified immunity on Pamela's due process claim.

III.  Conclusion

   The Sieberts had a reasonable expectation of privacy in their barn, and have presented sufficient evidence from which a jury could conclude that Severino violated their Fourth Amendment rights by entering their barn without a warrant. Of course, if a jury finds a constitutional violation, it will also need to assess the appropriate measure of damages for that constitutional violation. Pamela (but not Robert, who lacks standing) presented sufficient evidence to enable a jury to find a due process claim as well as a Fourth Amendment claim against Severino for seizing her horses without a warrant and without exigent circumstances. For the reasons set forth above, we also conclude that the facts read in the light most favorable to the Sieberts prevent Severino's claim of qualified immunity. Accordingly, we REVERSE and REMAND to the district court

for further proceedings consistent with
this opinion.

FOOTNOTES

/1 Because this appeal comes to us from summary
judgment, we present the facts in the light most
favorable to the Sieberts, drawing all reasonable
inferences in their favor. Lolling v. Patterson,
966 F.2d 230, 233 (7th Cir. 1992).

/2 The fact that Wright is a Fourth Circuit case is
irrelevant. See Donovan v. City of Milwaukee, 17
F.3d 944, 952 (7th Cir. 1994) ("In ascertaining
whether a particular right has been 'clearly
established' . . . this court has not required
binding precedent from the Supreme Court or the
Seventh Circuit.").

/3 Pamela may also have some special (or actual)
damages--albeit minor--resulting from the illegal
seizure of the horses, as in her deposition when
questioned as to damages, she mentioned the cost
of the gas she used to drive around tracking down
Severino and her horses.

/4 The district court noted that the Sieberts did
not present any evidence that Severino seized the
horses without a warrant, using this absence of
evidence as an alternative basis for rejecting
their Fourth Amendment claim. But in paragraph 13
of their complaint, the Sieberts alleged that
Severino entered their property and seized the
horses without a warrant, and in his answer
Severino admitted that he "seized the horses
pursuant to Illinois Humane Care for Animals Act,
but denie[d] the remaining allegations contained
in paragraph 13 of the complaint." This legalis-
tic response is obviously ambiguous as to whether
or not Severino had a warrant, but reading the
answer in the light most favorable to the Sie-
berts, the record supports their position that
Severino did not have a warrant. Moreover, at
oral argument, Severino's attorney admitted that
he did not have a warrant authorizing the seizure
of the horses, so rather than assume that his
catch-all denial to the allegations contained in
paragraph 13 falsely included the issue of the
existence of a warrant, we conclude that the
record establishes that no such warrant existed.
Additionally, it should be the government who
should be required to come forward with evidence
that a warrant exists--if it does--as the govern-
ment knows if it did or did not apply for the
warrant, and it will be difficult to prove the
negative, i.e., that no warrant was issued. Under
these circumstances, the district court's ratio-
nale will not suffice as a basis for rejecting
the Sieberts' Fourth Amendment claim.

/5 Also suspicious is the fact that the Notice of Apparent Violation which Severino taped to the Sieberts' door on December 16, 1996 stated that the horses were drinking from the creek, but in response to this litigation, Severino filed an affidavit in which he attested that "I observed that the creek which ran through the property was frozen and the horses were without water." It is difficult to fathom how the horses could be drinking from a frozen creek. These inconsistencies further create the reasonable inference that Severnio misrepresented the horses' condition.

/6 In fact, it may be that the reason the Humane Care for Animal Act does not require a warrant for the seizure of animals is because the Department of Agriculture will only authorize a warrantless seizure in cases involving exigent circumstances. To the extent that the Department does authorize the warrantless impoundment of animals in other non-emergency situations, we make no comment on the constitutionality of Section 70/11 applied in that context, as the case before us involves a different factual scenario.

/7 While the record indicates that to be appointed as a humane investigator a person must be instructed in classes and pass an open-book examination, the record fails to establish that these prerequisites qualify a person as being knowledgeable about the care of horses.

/8 Actually, both Pamela and Robert assert a due process claim, but as noted above, since Robert does not own the horses, he lacks standing to sue.

/9 While Porter involved the permanent deprivation of animals, "the requirement of due process, including a predeprivation hearing where feasible, applies to temporary as well as topermanent deprivations." Penn Central, 955 F.2d at 1162. Although, "[t]he shorter the deprivation in relation to the period required to complete the post-deprivation hearing, the less likely a predeprivation hearing is to be feasible." Id. But feasibility goes to the question of the fiscal and administrative burdens.

/10 The government may of course seize animals without a pre-deprivation hearing if exigent circumstances exist. Logan, 455 U.S. at 436. But, as discussed above, exigent circumstances did not justify Severino's actions.