*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

BRIGITTE LOUISE DEROUSSE,

Defendant-Appellee.

FOR PUBLICATION
May 5, 2022
9:00 a.m.

No. 358358
Jackson Circuit Court
LC No. 19-004435-FH

Before: BOONSTRA, P.J., and M. J. KELLY and SWARTZLE, JJ.

M. J. KELLY, J.

The prosecution appeals by leave granted[1] the trial court order partially granting defendant, Brigitte DeRousse's, motion to suppress evidence seized from two barns located outside the curtilage of DeRousse's home. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

On November 7, 2019, Shawn Lutz, an animal control officer in Jackson County, responded to a call that there was a cow running loose. When he arrived, the cow was in the roadway. He sounded his horn and hollered, and in response, the beast meandered back to DeRousse's property with Lutz following in his truck. Once on the property, the cow "jumped" the fence to its pen. Lutz, who intended to ensure that the cow was returned to its enclosure and to speak with its owner, observed an alarming number of dead animals on DeRousse's property, including some in carcass form and some that were skeletal. He also saw three Labrador dogs that appeared to be emaciated. From the "west pole barn," he could hear the barking and yipping of additional dogs. However, he was unable to observe them because the barn was "secured and there [were] no windows." Lutz learned from a neighbor that there had been multiple complaints of "animals at large" on DeRousse's property. Lutz later spoke with DeRousse, who acknowledged

---

[1] *People v DeRousse*, unpublished order of the Court of Appeals, entered November 8, 2021 (Docket No. 358358).

that the cow which had been running loose was a problem. She also acknowledged that there were a large number of dead animals on the property, but she said she did not know how they had died. Lutz sought a search warrant because he was concerned about the number of dead animals and the emaciated condition of the three dogs he observed.[2]

On November 8, 2019, he returned to DeRousse's property with the warrant and seized approximately 35 animals. From the west pole barn, he seized 23 dogs. He testified that the dogs did not have access to food and that there was feces and urine—up to one inch thick in places—covering the floors. One of the dogs was eating feces. None of the dogs had access to drinking water. Instead, three of the dogs shared a five-gallon bucket with "marginal green water" at the bottom, which the dogs could not reach because of the depth of the bucket. The other dogs had water containers with a small amount of water that was contaminated by urine and feces. A medical examination showed that all of the dogs had internal and external parasites. One dog had a tumor on its stomach. From the "east pole barn," Lutz seized a raccoon and two cows. The cows did not have access to food or water. Their enclosure was barely large enough to allow them to turn, and the floor was covered with urine and feces. Lutz also seized several animals located in two outside pens. In both pens, the water provided for the cows was algae-infested and frozen. Hay was available in one pen, but it was covered in a netting. The hay outside the second pen was also covered in netting and the cows had eaten what they could reach from their enclosure. In order to access the hay, the cows in the south pen had to navigate two dead cows. There was also one cow that was so emaciated that it could not stand. The property also had carcasses of dead chickens, a lamb, and a large snapping turtle, which was in a burlap bag near a butcher knife.

DeRousse was initially charged with abandonment/cruelty to 4 to 10 animals, MCL 750.50(4)(c). However, on September 22, 2020, following a probable-cause hearing, the charges were amended to abandonment/cruelty to 25 or more animals, MCL 750.50(4)(e). DeRousse moved to suppress evidence regarding the seizure of the animals. Relevant to the issue raised on appeal, DeRousse argued that the search warrant permitted officers to search "a single-family dwelling," which did not include the outbuildings on the property. Therefore, she contended that the searches were illegal. DeRousse additionally argued that the warrant authorized the seizure of two silver Labradors, a chocolate Labrador, a French bulldog, a Tea Cup chihuahua, nine cows, three sheep, and items related to rabies vaccinations, but that officers seized 23 dogs. DeRousse argued that the dogs were illegally taken from a red pole barn that was not included in the search warrant. DeRousse added that officers also seized a raccoon and the pelvis of a dead animal, which she believed were outside the scope of the warrant. Following an evidentiary hearing, the trial court partially granted DeRousse's motion and suppressed the evidence seized from the two pole barns. This appeal by leave granted follows.

---

[2] Lutz explained that the search warrant for DeRousse's property was the second warrant he had prepared.

## II. MOTION TO SUPPRESS

### A. STANDARD OF REVIEW

The prosecution contends that the trial court erred by partially granting DeRousse's motion to suppress. This Court reviews for clear error a trial court's findings at a suppression hearing. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that the trial court made a mistake." *People v Dillon*, 296 Mich App 506, 508; 822 NW2d 611 (2012). However, "the application of constitutional standards regarding searches and seizures to essentially uncontested facts is entitled to less deference; for this reason, we review de novo the trial court's ultimate ruling on the motion to suppress." *Williams*, 472 Mich at 313.

### B. ANALYSIS

### 1. WARRANT REQUIREMENT

The prosecution first argues that the search of the barns did not violate the Fourth Amendment because the barns were located outside the curtilage of DeRousse's home[3] and DeRousse did not have a reasonable expectation of privacy in either barn. We disagree.

The Fourth Amendment to the Constitution of the United States guarantees to the people the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." US Const, Am IV. It also provides that warrants shall not be issued except "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. Similarly, the Michigan Constitution guarantees that "[t]he person, houses, papers, possessions, electronic data, and electronic communications of every person shall be secure from unreasonable searches and seizures," and "[n]o warrant to search any place or to seize any person or things or to access electronic data or electronic communications shall issue without describing them, nor without probable cause, supported by oath or affirmation." Const 1963, art 1, § 11. Absent a compelling reason, Michigan courts must construe Const 1963, art 1, § 11 "to provide the same protection as that secured by the Fourth Amendment." *People v Collins*, 438 Mich 8, 25; 475 NW2d 684 (1991).

"A search within the meaning of the Fourth Amendment 'occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.' " *People v Jones*, 279 Mich App 86, 91; 755 NW2d 224 (2008), quoting *United States v Jacobsen*, 466 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). "The touchstone of the Fourth Amendment is reasonableness." *People v Hammerlund*, 504 Mich 442, 451; 939 NW2d 129 (2019). When "an individual has a reasonable expectation of privacy in the area searched, or the materials seized, a search has been conducted." *People v Whalen*, 390 Mich 672, 677; 213 NW2d 116 (1973). An expectation of privacy is reasonable "only if the individual exhibited an actual, subjective expectation of privacy and that actual expectation is one that society recognizes as reasonable." *People v Taylor*, 253

---

[3] The parties agreed below that the barns were located outside the curtilage of DeRousse's home. Accordingly, that issue is not before us on appeal.

Mich App 399, 405; 655 NW2d 291 (2002). "Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion." *Id*. When evaluating whether a defendant has a reasonable expectation of privacy in a building sufficient to challenge a search under the Fourth Amendment, "we must inquire whether [the] defendant took normal precautions to maintain his privacy—that is, precautions normally taken by those seeking privacy." *Id*.

The prosecution argues that DeRousse had no reasonable expectation of privacy in the barns because there was not a separate fence around either barn, both barns could be seen from the road, and they were both easily accessible from the road. Such facts, however, are pertinent to whether DeRousse had a reasonable expectation of privacy in the exteriors, not the interiors of the barns.

The prosecution also asserts that the barns were not associated with the intimate daily activities of DeRousse's home given that DeRousse kept animals in the barns and did not live in either barn. Finally, the prosecution claims that the barns were not locked and that DeRousse "failed to set up anything that showed that she had a privacy expectation in either barn." In making its argument, however, the prosecution ignores the record. Lutz testified that when he was on the property on November 7, 2019, the west barn was "secured" and, because it had no windows, he could not "get a visual ID" of the dogs that he could hear barking inside it. When he returned the next day, the barn was locked. Further, although the east barn had a partially open door, Lutz did not testify that he could see anything amiss when he peeked through that opening on November 7. Based on the record actually before us, the secured nature of the west barn reflects that DeRousse took normal precautions to maintain her privacy. Moreover, although the door to the east barn was partially open, given that nothing incriminating was observed through the entry, we are not persuaded that DeRousse lacked any reasonable expectation of privacy in the interior of the barn. Because DeRousse had a reasonable expectation of privacy in the interior of both barns, a warrant was required before Lutz could search either barn.

Our conclusion that DeRousse had a legitimate expectation of privacy in the interior of her barns is consistent with cases from our sister states. "Caselaw from sister states and federal courts is not binding precedent but may be relied on for its persuasive value." *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 727 n 5; 957 NW2d 858 (2020). We find persuasive the Supreme Court of Illinois's opinion in *People v Pittman*, 211 Ill 2d 502, 518-519; 813 NE2d 93 (2004). In that case, the court held that "[t]he fourth amendment protects structures other than dwellings, and those structures need not be within the curtilage of the home." The court concluded that the defendant in *Pittman*, 211 Ill 2d at 521, had a legitimate expectation of privacy in the barn when "defendant clearly had a possessory interest in the entire farm and had the ability to control or exclude others from the use of the property." The court held that the warrantless search of the barn was unreasonable under the Fourth Amendment unless the search fell within an exception to the warrant requirement. *Id*. at 523. Likewise, in *Siebert v Severino*, 256 F3d 648, 654 (CA 7, 2001), the United States Court of Appeals for the Seventh Circuit explained that the Supreme Court held

in *United States v Dunn*, 480 US 294, 300; 107 S Ct 1134; 94 L Ed 2d 326 (1987),[4] that officers could look through a barn's open doorway, but "did not hold that the police could *enter* the barn itself." The court held that there was a reasonable expectation of privacy in the barn. *Siebert*, 256 F3d at 661. Similarly, the United States Court of Appeals for the Fourth Circuit has held that an officer could make observations by looking through an open loft of a barn, but that an individual has a reasonable expectation of privacy in a barn, and, therefore, an officer could not enter without a warrant. *United States v Wright*, 991 F2d 1182 (CA 4, 1993). As the Seventh Circuit stated, "a reasonable state actor" would know that he needed a warrant in order to enter a fenced-in, closed structure near a person's home. *Siebert*, 256 F3d at 655. That is what occurred in this case. Lutz did not enter or attempt to seize animals before obtaining a warrant, and his testimony makes clear that he believed the warrant permitted him to enter the barns to search for and seize the animals located therein.

Moreover, none of the cases cited by the prosecution support a warrantless search of DeRousse's barns. The prosecution first references *People v Spencer*, unpublished per curiam opinion of the Court of Appeals, issued May 4, 2021 (Docket No. 304422), and *People v Green*, unpublished per curiam opinion of the Court of Appeals, issued April 9, 2015 (Docket Nos. 323433 and 323435),[5] for the proposition that a defendant does not have a reasonable expectation of privacy in barns located on his or her property. However, in *Spencer*, unpub op at 5, a panel of this Court held that "the officers were not on the curtilage when they knocked on the door of a pole barn in order to make contact with [the] defendant." The officers in *Spencer* did not enter the barns until the defendant provided consent. *Id*. at 2. Likewise, in *Green*, unpub op at 4-5, a panel of this Court held that the pole barn was not within the home's curtilage and that the officers did not conduct a search by approaching the pole barn when attempting to contact the residents of the home. The officers, however, did not enter the pole barn until after obtaining a search warrant. *Id*. at 2. Accordingly, neither *Green* nor *Spencer* supports the prosecution's argument that a warrantless search of the interiors of DeRousse's barns was permissible.

The prosecution further relies on *United States v Mooring*, 137 F3d 595, 596 (CA 8, 1998), in which the United States Court of Appeals for the Eighth Circuit affirmed the trial court's finding that a barn was not within the curtilage of a home. The Eighth Circuit explained that although the

---

[4] When discussing *Dunn*, Gillespie, Michigan Criminal Law & Procedure Search and Seizure (2d ed), § 2:21 explains:

> Significantly, the Court did not hold that structures outside the curtilage may themselves be entered and searched without warrant, the Court accepting "for the sake of argument" that they may not be, but held rather that observations of the contents made without entry are not barred by the Fourth Amendment. The Court's supposition is correct: Though the fields are not within the protection afforded to one's "person, houses, papers and effects," an outbuilding *is* a protected "house," though not a dwelling house, which falls within the core privacy values protected by the Fourth Amendment.

[5] Although an unpublished opinion is not binding, this Court may follow the opinion if it finds the reasoning persuasive. MCR 7.215(C)(1).

officer's view of the barn was obscured, "this fact in itself does not establish the barn should be included within the farmhouse's Fourth Amendment protection." But the officers in *Mooring*, 137 F3d at 596, did not enter the barn until after they obtained a warrant. As a result, it is inapposite.

The prosecution further relies on *United States v Long*, 674 F2d 848, 852-853 (CA 11, 1982), in which the United States Court of Appeals for the Eleventh Circuit held that "there was no legitimate expectation [of privacy] that [the defendant] or anyone else could claim in the contents of the barn" because there was no legitimate expectation of privacy in outbuildings unless they were part of the curtilage of a home. However, the court also explained that there was *no residence* on the property and that "even if we had found that a legitimate expectation of privacy could have existed in the contents of the barn, it is highly doubtful that [the defendant] himself had such an expectation since, at the time of the search, not even his wife owned the lands on which the barn was situated." *Id*. at 853 n 6. Moreover, the officer in *Long* climbed a fence in order to look into the door of the barn, but he did not search the barn until he obtained a search warrant. *Id*. at 852. This case is distinguishable from *Long* both because DeRousse's home is situated on the property, she took steps to secure it so as to exclude others, and because no search of the barns occurred until after a warrant had been sought.

Finally, the prosecution relies on *Oliver v United States*, 466 US 170; 104 S Ct 1735; 80 L Ed 2d 214 (1984), to argue that it is "well established that the Fourth Amendment's protection does not extend to areas outside the home's curtilage because no expectation of privacy attaches." Yet, in *Oliver*, 466 US at 178, the Supreme Court stated that "an individual may not legitimately demand privacy for activities *conducted out of doors in fields*, except in the area immediately surrounding the home." (Emphasis added.) The Supreme Court explained that there was no "societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields," which were "accessible to the public and the police in ways that a home, an office, or commercial structure would not be." *Id*. at 179. The Supreme Court, therefore, recognized that individuals would have a different privacy expectation in an open field than in an enclosed structure. Likewise, as in this case, DeRousse had a privacy expectation in her barns that she did not have in her fields.

In sum, the prosecution's argument that DeRousse lacked an expectation of privacy in the barns is both factually and legally unsupported. A warrant was required to search the barns, notwithstanding that they were located outside the curtilage of DeRousse's home.

## 2. SCOPE OF THE WARRANT

The prosecution next argues that the search warrant issued authorized the search of the barns. We disagree.

The search warrant issued in this case described the place to be searched as:

1. The person, place or thing to be searched is described as and is located at:

12505 Dearmyer Road, in Columbia Township, it is a one story single-family dwelling. The residence is a single story ranch tan in color with vinyl siding. The residence is occupied with a brown shingled roof. The front door of the

residence faces south and the numbers 12505 are on the front of the house. The residence is located in Columbia Township, Jackson County and State of Michigan.

2. The PROPERTY is to be searched due to animals running at large and several dead animals found on the property. Property to be seized is specifically described as:

A total of two silver labs, a chocolate lab, a French Bull Dog and a Tea Cup Chihuahua, 9 cows and 3 sheep. Items relates to rabies vaccines administered by animal owner.

The two pole barns on the property are not described, nor are they even referenced in the search warrant. Further, although the affidavit supporting the search warrant references a dog kennel being operated out of the west pole barn, the affiant did not describe or mention that pole barn when describing the place that he was seeking a warrant to search. Moreover, given that Lutz observed the animals described in the affidavit while they were in the open and without entering any structures on the property, it is clear that they were not concealed in a barn. Thus, the description of the livestock to be seized does not operate to extend the scope of the warrant from the place specifically described. Finally, as agreed to by the parties, the barns are not located within the curtilage of the residence located at 12505 Dearmyer Road.

As explained by this Court in *People v McGhee*, 255 Mich App 623, 626; 662 NW2d 777 (2003):

The test for determining whether the description in the warrant is sufficient to satisfy the particularity requirement is whether the description is such that the officers with a search warrant can with reasonable effort ascertain and identify the place intended. *Steele v United States*, 267 US 498, 503; 45 S Ct 414; 69 L Ed 757 (1925); *United States v Gahagan*, 865 F2d 1490, 1496 (CA 6, 1989). The Fourth Amendment safeguard is designed to require a description that particularly points to a definitely ascertainable place so as to exclude all others. *Id.* Thus, the test for determining the sufficiency of the description of the place to be searched is (1) whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and (2) whether there is any reasonable probability that another premises might be mistakenly searched. *Id.* at 1496-1497. The requirement is designed to avoid the risk of the wrong property being searched or seized. [Quotation marks and citation omitted.]

Here, because the search warrant describes with great particularity the residence, but does not reference the barns located outside the curtilage of the home, we conclude that the warrant does not apply to the barns. Our conclusion is based on our Supreme Court's decision in *People v Bawiec*, 228 Mich 32; 199 NW 702 (1924). In that case, the search warrant described the place to be searched as

'* * * a two-story frame house unpainted, partly shingled upon the sides, located on the north half of the northeast quarter of section 5, in township of Krakow, in

said county and state and occupied by Joe Bawiec and John Bawiec, as a private dwelling and as a place for the manufacture, storage, sale, furnishing and giving away of intoxicating liquor.' [*Id*. at 33.]

Rather than search the place described, the police searched "an old log house some 18 or 20 feet away and disconnected from the frame house, but within the curtilage . . . ." *Id*. Our Supreme Court held that

> while this court has treated as surplusage misdescriptions where the place to be searched has been otherwise described with such definiteness as to leave no discretion in the officer, *we have not thus far held that a search warrant made valid by a definite description pointing only to a specific building and directing a search therein justifies a search of another building not described although located in the same vicinity.* Nor do we think we should so hold. It is permissible to direct in one warrant the search of the house and outbuildings within the curtilage. [*Id*. at 35 (emphasis added).]

The Court concluded that because only the dwelling house was definitely described and the outbuilding was not described at all, the search of the outbuilding exceeded the scope of the warrant. *Id*. at 35-36. As recognized by this Court in *McGhee*, 255 Mich App at 632, *Bawiec* has not been overruled or challenged. Therefore, its central holding—that the description of one building does not warrant the search of a building on the same property that is not particularly described—must be applied by this Court.[6] [7]

Although the prosecution also relies on *People v Hampton*, 237 Mich App 143; 603 NW2d 270 (1999), in which this Court upheld a search when the affidavit and search warrant incorrectly described the home on the fourth page, but correctly described it on the first page, this situation is distinguishable because Lutz's affidavit and the search warrant both accurately described DeRousse's residence, but not any other buildings on the property. Likewise, the prosecution's reliance on *People v Jones*, 249 Mich App 131, 139; 640 NW2d 898 (2002) is misplaced. In that case, the police searched a vehicle located within the curtilage of the defendant's home. Nothing

---

[6] We note that this Court posited in *McGhee* that, based on changes to federal Fourth Amendment jurisprudence, our Supreme Court would likely reject the *Bawiec* analysis were it to decide the issue again. See *McGhee*, 255 Mich App at 633-634. Yet, this Court is bound to follow decisions by our Supreme Court "except where those decisions have clearly been overruled or superseded . . . ." *Estate of Pearce v Eaton Co Rd Comm*, 507 Mich 183, 196; 968 NW2d 323 (2021). Here, as *Bawiec* has not been clearly overruled or superseded by our Supreme Court, we must follow *Bawiec*.

[7] The changes noted in *McGhee* would not necessarily resolve the issue on appeal. In *McGhee*, this Court noted that various courts have held that the Fourth Amendment is not violated by searches of outbuildings *within* the curtilage of a residence described in a search warrant. *McGhee*, 255 Mich App at 633-634. However, the barns in this case are located outside the curtilage of DeRousse's home.

in that opinion indicated that a vehicle inside the curtilage of the defendant's home should be treated the same as a structure outside the curtilage of the defendant's home.

In sum, the warrant described with particularity only the residence located on the property. It did not authorize—even indirectly—the search of other structures located on the property. As a result, the search of those structures was a warrantless search.

### 3. GOOD-FAITH EXCEPTION

The prosecution finally argues that even if a warrant was required and the warrant issued did not authorize the search of the barns, the trial court erred by suppressing the evidence because the good-faith exception to the exclusionary rule applies. We disagree.

Relying on federal precedent, our Supreme Court adopted the good-faith exception to the exclusionary rule in *People v Goldston*, 470 Mich 523, 529; 682 NW2d 479 (2004). Under the good-faith exception, evidence obtained through a defective search warrant is admissible when the executing officer relied upon the validity of the warrant in objective good faith. *Id*. at 525-526, 540-541.[8] In adopting the good-faith exception, our Supreme Court noted that the primary purpose of the exclusionary rule is to deter "official misconduct by removing incentives to engage in unreasonable searches and seizures." *Id*. at 529. The Court reasoned that "suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated warrant" produces "marginal or nonexistent benefits" and "cannot justify the substantial costs of exclusion." *Id*. at 530, quoting *United States v Leon*, 468 US 897, 922; 104 S Ct 3405, 3420; 82 L Ed 2d 677 (1984). See also *People v Hughes (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 338030); slip op at ____ (noting that in cases where an "unlawful search" is "not attributable to an error made by a neutral and detached magistrate, the rationale underlying the good-faith exception does not apply[.]").

Here, a search warrant was authorized. Although that warrant was not defective, it did not authorize a search of the barns located outside the curtilage of DeRousse's residence. As a result, the search of the barns was conducted without a warrant. The good-faith exception has been extended to cases where a search is conducted without a warrant. See *Illinois v Krull*, 480 US 340, 346; 107 S Ct 1160; 94 L Ed 2d 364 (1987) (extending the good-faith exception to the exclusionary rule where the police conducted a warrantless search in reliance on a statute) and *Arizona v Evans*, 514 US 1, 16; 115 St Ct 1185; 131 L Ed 2d 34 (1995) (extending the good-faith exception where a search was made in reliance on clerical errors made by court employees). However, the prosecution has not argued that such an extension is warranted in this case. And, even if it were to do so, the record does not indicate that Lutz conducted his search in objectively reasonable

---

[8] Exceptions to the good-faith exception exist. Specifically, as explained in *United States v Leon*, 468 US 897, 923; 104 S Ct 3405; 82 L Ed 2d 677 (1984), even if the officers acted in good faith reliance on a defective search warrant, suppression is still proper in cases where the judge is misled by knowingly false statements, where the judge abandons his judicial role such that "no reasonably well trained officer should rely on the warrant," or where the warrant is so lacking in details and particulars that no officer could reasonably believe it to be valid.

reliance on any statute or clerical error. Instead, he testified that he believed the warrant authorized the search of the barns.[9] As a result, we conclude that suppression of the evidence seized during the warrantless search of the barns was not barred by the good-faith exception to the exclusionary rule.

Affirmed.

/s/ Michael J. Kelly
/s/ Brock A. Swartzle

---

[9] Although Lutz's testimony is sufficient to show his subjective good faith, the good-faith exception requires that the officer conducting the search did so while acting in objective, good-faith reliance on a search warrant. On appeal, the prosecution has made only a cursory argument that Lutz was acting in good-faith, noting his testimony, and citing to a single unpublished decision by the Sixth Circuit Court of Appeals. However, it has offered no analysis as to why, under the specific facts of this case, Lutz's actions were objectively reasonable. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Consequently, even if we were to conclude that it was appropriate to apply the good-faith exception to the warrantless search of the barns, we would nevertheless conclude that the prosecution has abandoned its argument on appeal.